838 A.2d 472 (2003)
365 N.J. Super. 84
The COMMUNITY HOSPITAL GROUP INC., t/a JFK Medical Center, Plaintiff-Appellant,
v.
Jay MORE, M.D. and Somerset Medical Center, Defendants-Respondents, and
Dr. James Chimenti and Neurosurgical Associates at Park Avenue, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 2003.
Decided December 29, 2003.
*474 Carmine A. Iannaccone argued the cause for appellant (Epstein, Becker & Green, attorneys; Mr. Iannaccone, of counsel; Jatinder K. Sharma, on the brief).
Robert J. Conroy argued the cause for respondent Jay More, M.D. (Kern, Augustine, Conroy & Schoppmann, attorneys; Mr. Conroy, of counsel; R. Bruce Crelin, on the brief).
James J. Shrager argued the cause for respondent Somerset Medical Center (Norris, McLaughlin & Marcus, attorneys; Mr. Shrager and Rachel A. Wingerter, on the brief).
Before Judges PRESSLER, CIANCIA and ALLEY.
*473 The opinion of the court was delivered by ALLEY, J.A.D.
Plaintiff The Community Hospital Group, t/a JFK Medical Center, seeks to enforce a post-employment restrictive covenant with defendant neurosurgeon Jay More, a former employee of plaintiff's New Jersey Neuroscience Institute. The covenant as written states that defendant is prohibited from practicing within a thirty-mile radius of plaintiff's location in Edison for a period of two years. Plaintiff claims that after his resignation from plaintiff's employ in July 2002 defendant violated the covenant by joining another neurosurgery practice located several miles from plaintiff.
Plaintiff applied to the Chancery Division to preliminarily enjoin defendant from *475 engaging in the new practice, relief which that court denied in an order dated November 21, 2002. We denied plaintiff's motion for leave to appeal on January 8, 2003, but the Supreme Court granted plaintiff's motion for leave to appeal in a March 25, 2003 order that summarily remanded the matter to us "to consider the appeal on its merits." Having done so, we grant the preliminary injunction on the terms stated below.
Before the preliminary injunction hearing the parties took considerable discovery. The following facts, on which we rely in this appeal, are essentially undisputed.

I
Plaintiff JFK Medical Center is a not-for-profit hospital in Edison. The New Jersey Neuroscience Institute is part of the Hospital and is a not-for-profit medical care provider specializing in the treatment of neurological disorders. The Institute's mission goals are clinical care, education, and research in the areas of neurology and neurosurgery. It deems itself a "tertiary care provider" of neurology-related services, receiving the majority of its patients through referrals from physicians in other specialties.
Since its inception in 1992, the Institute has sought to develop an extensive clinical neurological program and has devoted approximately fourteen million dollars to its development. It also invests approximately two hundred thousand dollars annually on advertising and promotion. It offers a stroke treatment program, as well as epilepsy and neuro-oncology programs, and is the only New Jersey medical facility to provide "Gamma Knife" treatment, a non-surgical technique used to treat certain brain tumors and vascular malformations.
In 1996, the Institute established an accredited neurological residency program, an activity that can be distinguished from a neurosurgery program. It claims that its continued viability is dependent upon its ability to recruit and retain a sufficient number of skilled physicians that will enable it to generate the necessary volume of patients to support its services, such as the residency program. It claims that without a sufficient number of physicians on staff, it would be unable to attract the case diversity necessary to provide training for the residency program and, therefore, might lose its accreditation.
On July 1, 1994, plaintiff hired defendant as a neurosurgeon immediately upon the completion of his residency at Mt. Sinai Hospital in New York. Defendant did not bring with him to this position any practice or patient base. In December 1994, the parties entered into a written one-year employment contract whose term ran until June 30, 1995. The parties entered into successor employment agreements effective July 1, 1995, for four years and July 1, 1999, for a term of five years.
Each of the three employment agreements contained post-employment restrictive covenants which prohibited defendant from certain medical practice within a thirty-mile radius of plaintiff. The 1994 agreement stated that the duration of the restrictions respecting new employment was for "two (2) years" after termination. The 1995 and 1999 agreements stated that the duration of the restrictions was for "a period of one (2) years [sic]." Plaintiff contends that the reference in these provisions to "one" year is clearly a typographical error. Defendant does not concede that these covenants have a two-year duration, but we note that all three agreements contained additional restraints for periods of two years on any attempts by defendant to acquire plaintiff's patients, referrals, or staff for his subsequent practice. We quote those provisions below.
*476 The first of the post-employment restrictive covenants, contained in the 1994 agreement, included a prohibition on defendant's practice of neurosurgery within a thirty-mile radius of the Institute. The prohibition in the subsequent agreements was also for thirty miles but was expanded to cover all medical practice. The most recent agreement, effective July 1, 1999, states in Article 7.14(a):
[F]or a period of one (2) years following the date of termination of MORE's employment for any reason whatsoever, MORE shall not, directly or indirectly, own, manage, operate, control or be employed by, participate in or be connected in any manner with the ownership, management, operation or control of any medical practice, nor engage in the practice of medicine, in any of its branches, within a 30 mile radius of the HOSPITAL, providing the same or substantially the same medical care as the Services outlined in this agreement.
Both the prayer for relief in the First Count of the Complaint and the proposed relief in the proposed order presented by plaintiff to the trial court would prohibit defendant from the practice of neurosurgery, not from other branches of medicine, however, and in light thereof we limit our consideration of the scope of relief accordingly.
The provisions of Article 7.14(a) of the 1999 agreement require defendant to refrain from soliciting any of plaintiff's patients or patient referrals for a two (2) year period following his separation:
During the term of this Agreement and for a period of two (2) years following the date of termination of MORE's employment for any reason whatsoever, MORE shall not, directly or indirectly, for his own account or for the account of others, induce any patients of the HOSPITAL to patronize any professional health care provider other than the HOSPITAL; canvas or solicit any business relationship from any patients of the HOSPITAL; directly or indirectly request or advise any patients of the HOSPITAL to withdraw, curtail, or cancel any patients' business with the HOSPITAL; or directly or indirectly disclose to any other person, firm or corporation the names or addresses of any patients of the HOSPITAL.
Defendant further agreed in Article 7.14(c) of that agreement that he would not solicit or induce any employees of plaintiff to leave their employment for a two-year period.
That agreement also stated in Article 7.14(e) that these post-employment restraints were reasonable:
MORE acknowledges that: (i) the terms contained in Article 7.14 are necessary and appropriate for the reasonable protection of
the HOSPITAL's interests;, (ii) each and every covenant and restriction is reasonable in respect to its subject matter, length of time and geographical area; and (iii) the HOSPITAL has been induced to enter into this Agreement with EMPLOYEE and is relying upon the representation and covenant by MORE that he will abide by and be bound by each of the covenants and agreements set forth in this Article 7.14.
Moreover, the agreement provided that plaintiff had the right to seek injunctive relief to enforce the post-employment restraints and that defendant would be liable for its legal costs and expenses, including attorneys fees, in connection with any such application.
For the years of defendant's employment, plaintiff agreed under the respective contracts to pay him the following base annual salaries:

 1994-95 - $180,000

*477
 1995-96 - $225,000
 1996-97 - $247,500
 1997-98 - $272,250
 1998-99 - $299,475
 1999-00 - $330,000
 2000-01 - $354,750
 2001-02 - $381,356

Throughout defendant's employment, in addition to paying his salary plaintiff bore other costs related to the efforts to develop, enhance and maintain his neurosurgical practice. These included expenses associated with continuing education courses, costs related to keeping his medical licenses current, defendant's medical malpractice insurance of approximately $25,000 annually, tuition reimbursement, and certain reimbursement for business travel, medical societies' dues, and medical journals and subscriptions.
During defendant's employment, plaintiff engaged in certain efforts to promote him to the public as well as to other specialists as one of its "sub-specialists" and "experts." He was featured as an expert speaker at seminars and programs sponsored by the Institute and geared toward the referral sources.
In defendant's first six months with plaintiff, his practice grew from no patient surgeries to between thirty-five to forty surgeries. Beginning the following year, the number of surgeries he performed increased annually during his employment, at least until September 11, 2001. The growth of his practice during the course of his employment was attributed by plaintiff to his increased visibility based on his continued employment and association with plaintiff. Shortly before leaving plaintiff's employ, defendant referred to himself as the "top producer" and "rainmaker" among plaintiff's physicians.
On July 17, 2001, defendant submitted his letter of resignation from plaintiff's employment effective July 17, 2002. On January 18, 2002, defendant was informed that plaintiff did not want to compensate him for his accrued vacation time and that he needed to use his vacation time. Since this amounted to nearly five months vacation, defendant offered to forego a portion of this vacation time, but plaintiff declined.
Defendant began discussions with Neurosurgical Associates at Park Avenue (NAPA) in May 2002 regarding the possibility that he might join their practice. On July 22, 2002, defendant joined NAPA's practice, which was located approximately five miles from plaintiff.
Recently defendant received medical staff privileges at Somerset Medical Center (SMC), a 355-bed medical center in Somerville, which is located within the thirty-mile radius. SMC provides a variety of emergency, medical/surgical and rehabilitative services in the central New Jersey area. Affiliated with the University of Medicine and Dentistry of New Jersey, SMC serves as a teaching hospital for a three-year residency program in the areas of family practice and surgery. Its medical and dental staffs represent the major medical and surgical specialties.
Plaintiff in part bases its claims to the reasonableness of the restrictive covenant on evidence that it serves patients residing in or received from a referral base located throughout the thirty-mile area.
A number of New Jersey institutions outside the thirty-mile radius have significant numbers of neurosurgical patients. These include Englewood Hospital, Holy Name Hospital in Teaneck, and Valley Hospital in Ridgewood. Defendant did not apply for privileges at any of these institutions, nor did he do so at a number of hospitals located in parts of Manhattan, the Bronx, Queens, and Long Island outside the thirty-mile radius. He "continues *478 to receive employment opportunities from across the country ... and many of these practices offer packages well in excess of what ... [he] was getting [at the Institute]."
It appears undisputed that at least five other institutions deliver extensive neurosurgical care within a thirty-mile radius of the plaintiff's location and that "each of these five institutions appears to [have] a sufficient number of neurosurgeons to cover."
There was evidence that patients routinely travel more than thirty miles to seek specialized care such as neurosurgery. Plaintiff, however, seeks no more than a thirty-mile restriction, as this is where the majority of its patient referral sources is located.

II
It is firmly established that the authority to grant injunctive relief is within the province of the Chancery Division. Horizon Health Ctr. v. Felicissimo, 135 N.J. 126, 137, 638 A.2d 1260 (1994). We review a trial court's decision to deny a preliminary injunction under an abuse of discretion standard. Nat'l Starch and Chem. Corp. v. Parker Chem. Corp., 219 N.J.Super. 158, 162, 530 A.2d 31 (App.Div. 1987). Judicial abuse of discretion is tantamount to harmful error, i.e., error clearly capable of producing an unjust result. See Higgins v. Polk, 14 N.J. 490, 493, 103 A.2d 1 (1954); see also R. 2:10-2.
Plaintiff contends that the trial court misconstrued the New Jersey standards governing the enforceability of restrictive covenants and that the court misapplied the Supreme Court's holding in Karlin v. Weinberg, 77 N.J. 408, 390 A.2d 1161 (1978). Plaintiff contends that unless we grant the preliminary injunction it will suffer irreparable harm by the erosion of its patient base.
A four-prong test for determining whether an applicant is entitled to preliminary injunctive relief was set forth by the Supreme Court in Crowe v. De Gioia, 90 N.J. 126, 447 A.2d 173 (1982). First, an application for preliminary injunctive relief should be granted only "when necessary to prevent irreparable harm." Id. at 132, 447 A.2d 173. The second prong requires that the legal right underlying the applicant's claim be settled as a matter of law. Id. at 133, 447 A.2d 173. The third prong requires the applicant to "make a preliminary showing of a reasonable probability of ultimate success on the merits." Ibid. Fourth, the court also must balance the resulting hardship to the parties in granting or denying preliminary injunctive relief. Id. at 134, 447 A.2d 173.
Here, applying the first and third prongs of the Crowe test, the trial court held that plaintiff failed to carry its burden for obtaining preliminary relief. The court's concise analysis began by intimating that plaintiff failed to show that it faced irreparable harm if temporary relief was denied. The judge stated, "I don't know all of the facts that will be presented at trial and certainly the trial judge will have to weigh the facts very carefully but at this stage one does get the distinct impression that ... what is driving the case ... is a loss of income."
The court next addressed the issue of likelihood of success, focusing on the standard for enforcing restrictive covenants between physicians under Karlin. In Karlin, the parties were both medical doctors engaged in dermatology, and the plaintiff, who had established the practice, hired the defendant contingent on the completion of his education, internship, and residency requirements. 77 N.J. at 412, 390 A.2d 1161. The defendant had never *479 practiced medicine in New Jersey prior to joining plaintiff's practice. Ibid.
The parties subsequently entered into a one-year employment contract that contained the following provision:
Upon the termination of Dr. Weinberg's employment hereunder for any reason whatsoever, he shall not, for a period of five years thereafter, except with the written consent of Dr. Karlin, engage in the practice of dermatology within a 10 mile radius of 60 Broadway, Denville, New Jersey.
[Ibid.]
A dispute arose, the partnership dissolved, and the plaintiff continued to practice at the previous address. Id. at 413, 390 A.2d 1161. When the defendant started up a new practice just a few doors away the plaintiff sought an injunction to enforce the restrictive covenant between them. Ibid. The trial court denied the plaintiff injunctive relief and granted partial summary judgment in favor of the defendant. Id. at 414, 390 A.2d 1161.
Although the trial court held that restrictive covenants between physicians are per se unreasonable, we reversed, finding that the basis relied upon by the trial court, namely, that restrictive covenants between attorneys are unenforceable, did not apply to restrictive covenants between physicians. Ibid. We found "that plaintiff had a legitimate interest entitled to protection and that this interest was recognizable absent a showing of detriment to the public." Ibid.
The Supreme Court in Karlin described the issue thus: "whether a post-employment restrictive covenant ancillary to an employment contract between physicians is per se unreasonable and hence unenforceable...." Id. at 411, 390 A.2d 1161. By a vote of four to three, the Court found that physicians have a "legitimate interest" in protecting their relationships with patients, explaining:
The instant case ... is reflective of the typical factual situation, demonstrat[ing] the legitimacy of the employer-physician's interest in protecting his ongoing relationship with his patients. Dr. Karlin, by virtue of his efforts, expenditures and reputation, has developed a significant practice, and only if the restrictive covenant is given effect can he hope to protect in some measure his legitimate interest in preserving his ongoing relationship with his patients.
[Id. at 417, 390 A.2d 1161.]
The Supreme Court then approved our reasoning that restrictive covenants among attorneys are readily distinguishable from those involving physicians. Id. at 419, 390 A.2d 1161. The Court noted that the covenant between the parties did not, as a matter of law, deprive any patients from continuing their relationship with the defendant. Ibid. Further, the Court observed that while the Code of Professional Responsibility forbids restrictive covenants among attorneys, there is no comparable regulation by the Board of Medical Examiners or statute regarding physicians. Id. at 420, 390 A.2d 1161.
The Court held that restrictive covenants between physicians were not per se unreasonable and unenforceable and instructed that a three-part test be applied on remand, namely: "the trial court must determine whether the covenant in question `protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public.'" Id. at 422, 390 A.2d 1161 (quoting Solari Indus., Inc. v. Malady, 55 N.J. 571, 576, 264 A.2d 53 (1970)).

III
The analysis in Karlin proceeded as follows: Addressing each factor of the Solari *480 three-part test independently, the Court began its analysis by recognizing that the employing physician had a legitimate interest in protecting his relationship with his patients. Id. at 423, 390 A.2d 1161. First, the Court emphasized that restrictive covenants are unenforceable beyond the period of time needed for an employing physician "to demonstrate his effectiveness to the patients." It recognized, however, the potential need for longer restrictions "in medical specialties where the number of contacts between the physician and patient are relatively infrequent...." Ibid. Second, the Court held that restrictive covenants will not be enforced "beyond the geographical area needed to protect the employer's practice." Ibid. Lastly, the Court held that covenants may only restrict the departing employee from engaging in activities which are in competition with the former employer. Ibid.
As to the second prong, which precludes a restrictive covenant from imposing an undue hardship on a departing employee, and holding that personal hardship alone is insufficient to constitute undue hardship, the Court declared that the focus should be on the "likelihood of the employee finding work in his field elsewhere" and instructed trial courts to "examine the reason for the termination of the relationship between the parties to the employment contract." Ibid.
Lastly, the Court instructed the lower courts to examine the impact that enforcement of the restrictive covenant would have on the community. Id. at 424, 390 A.2d 1161. The Court observed that the focus here should be on the demand for the departing physician's services and the likelihood that preexisting physicians in the area are capable of providing these services. Ibid. The Court qualified the focus on the public interest factor when it held:
If enforcement of the covenant would result in a shortage of physicians within the area in question, then the court must determine whether this shortage would be alleviated by new physicians establishing practices in the area. It should examine also the degree to which enforcement of the covenant would foreclose resort to the services of the "departing" physician by those of his patients who might otherwise desire to seek him out at his new location.
[Ibid.]
Also under the public interest factor, the trial court must examine whether the restrictive covenant's geographical limits preclude existing patients from continuing to receive treatment. Ibid. If the geographical dimensions of the restrictive covenant constitute such a burden on existing patients that they are practically prevented from receiving treatment, the trial court is instructed to "consider the advisability of restricting the covenant's geographical scope in light of the number of patients who would be so restricted." Ibid.

IV

(A)
We thus consider the Karlin/Solari standards as applied to the present restrictive covenant and in light of Crowe. The trial court here found that plaintiff failed to meet its burden under the likelihood of success on the merits prong of Crowe. With only a summary discussion of each of the three Karlin factors, the court began its analysis by expressing doubt as to whether the restrictive covenant protected a legitimate interest of plaintiff. The court stated, "With regard to plaintiff's contention that the covenant does protect a legitimate interest of the employer, again, I'm not convinced that is so." Next, *481 the court found that even if there was a legitimate protectable interest involved, that interest would be offset by the undue hardship imposed on defendant. Finally, the court opined that "enforcement of the covenant would impair the public interest," thus finding that the final Karlin prong weighed in favor of defendant.
Plaintiff asserts that the trial court erred in finding that it failed to show either irreparable harm or the likelihood of success as required under Crowe. First, plaintiff contends that the trial court erred in failing to recognize that "[defendant's] siphoning its patient referral base to his new practice" is irreparably harming it. Plaintiff argues that without a sufficient patient base it is incapable of "providing clinical care in the areas of neurology and neurosurgery, educating residents, and conducting research." Second, plaintiff contends that the trial court erred by (1) failing to recognize a "protectable interest" in its patient referral base, (2) holding that defendant would suffer undue hardship if the restrictive covenant was enforced, and (3) finding that enforcement of the restrictive covenant was injurious to the public interest.
Defendant urges, however, that the trial court did not abuse its discretion in ruling that plaintiff failed to meet its burden under the Crowe standards. Defendant first argues that because plaintiff failed to "put forward anything other than economic damages as justification for its purported `irreparable harm,'" the court "did not abuse its discretion in concluding that the plaintiff had failed to demonstrate irreparable harm." With regard to the court's finding that plaintiff failed to show a reasonable likelihood of success on the merits, defendant asserts that the restrictive covenant was unenforceable under Karlin and, therefore, injunctive relief was properly denied.

(B)
As to irreparable harm, we conclude that plaintiff has made a sufficient showing that it stands to suffer such harm if it is not awarded injunctive relief. Generally, harm which is incapable of being adequately redressed by monetary damages is considered irreparable in equity. Crowe, supra, at 132-33, 447 A.2d 173. Here, plaintiff is a non-profit institution established not only to provide clinical care but also education and research in the field of neurology. It needs a broad patient base to provide the diversity and caseload required to support education and research. An "after-the-fact" award of damages will not enable it to meet these goals. Plaintiff employs entry-level physicians, such as defendant, upon whom it relies in turn to develop extensive patient and referral bases. These investments cannot be recouped through monetary damage awards because these referral networks result from relationships formed between secondary care providers and plaintiff's specialists. This threat to the vitality of plaintiff's institutional framework is not capable of being truly remedied by damages. Money or economic harm may be driving the interests of one or more parties to the litigation, as the trial court felt was the case here, but this of itself does not mean that the potential harm is not irreparable.
Second, plaintiff argues that it relies on its reputation and institutional standing to attract a sufficient number of neurosurgeons and residents to support these programs. Harm to plaintiff's reputation for being capable of maintaining a sufficient patient or referral base could have a chilling effect on its ability to recruit. Any diminution of its reputation regarding these types of services is not readily capable of being remedied by monetary damages.

*482 (C)
As to the likelihood of success on the merits, the trial court also found that plaintiff failed to meet its burden under this part of the Crowe test. We are satisfied, however, based on the record developed that the court misapplied the Karlin standard under which such restrictive covenants are examined when it held that plaintiff failed to demonstrate a reasonable likelihood that the covenant here was enforceable. The court was incorrect in observing that plaintiff failed to show that the covenant protected a legitimate, protectable interest.
Plaintiff's contention that its referral base constitutes a protectable interest as required in Karlin rests upon the assertion that an erosion of the patient base cannot be redressed through monetary damages. Plaintiff argues that "there is no way to calculate presently the future harm resultant from lost relationships because eventually there is a house of cards effect that can threaten the very existence of a practice, particularly for an institution that requires not only a minimum number of patients to survive but a diverse number of cases to support its research and teaching goals."
Defendant would minimize the force of Karlin because that case involved two physicians and the plaintiff physician in Karlin had a legitimate interest in protecting his own relationships with his patients. Defendant contends that because plaintiff here is an institution, not a physician, it cannot have patient relationships. Defendant argues that Karlin does not stand for the proposition that physician employers have the right to prevent former employee-physicians from treating their own patients, and that plaintiff's attempt to restrict his right to treat patients is intended only to prevent competition.
Defendant's contention that an institution does not have a legitimate interest in protecting its patient base under Karlin is not supported by law. While the employer in Karlin was also a physician, the Court does not appear to base its conclusion on this fact. A careful reading of the Court's opinion appears to suggest that it was the plaintiff's status as an employer, rather than as a physician, that was controlling. Indeed, the Court repeatedly referred to the plaintiff as "employer." Defendant concedes that Karlin recognized the legitimate interest the employer-physician had in protecting his relationship with his patients, but he argues that plaintiff is incapable of forming a similar relationship. That "interest" appeared to be in the context of business, however, rather than a doctor-patient relationship, since patients are always free to seek treatment from whomever they choose. Also instructive is the Court's citation of Whitmyer Brothers, Inc. v. Doyle, 58 N.J. 25, 33, 274 A.2d 577 (1971), for the proposition that an "employer has a patently legitimate interest... in protecting his customer relationships." Karlin, supra, 77 N.J. at 417, 390 A.2d 1161 (emphasis added). Finally, defendant's proposition that an institution cannot have patients, only customers, appears to be a distinction with little difference in this case, where the non-physician employer's services are essentially focused on the provision of medical care.
The trial court failed to provide any findings for its conclusion that the restrictive covenant did not protect any legitimate interests of plaintiff. We are persuaded, however, that such legitimate interests arise in protecting patient relationships. See Karlin, supra, 77 N.J. at 417, 390 A.2d 1161. Plaintiff's evidence supports the conclusion that enforcement of the restrictive covenant is necessary to protect its patient and referral relationships. In the circumstances, the trial *483 court misapplied its discretion in finding that plaintiff failed to demonstrate the existence of a legitimate interest under the first prong of the Karlin test.

(D)
We note that the trial court found that plaintiff failed to satisfy its burden of showing that enforcement of the restrictive covenant would not impose an undue hardship on defendant. It stated:
Assuming, however, that there is a legitimate protectable interest, it would seem to me that that interest is more or less offset by the undue hardship on the employee and looking at it from a viewpoint most favorable to the plaintiff, the best that could be said, again, on this record, is that the matter is in equipoise and if the matter is in equipoise because of the burden place upon the plaintiff, the plaintiff must not prevail with regard to this application.
Plaintiff contends that the court erred in finding undue hardship would result to defendant because (1) the restrictive covenant does not impose a limitation on patient choice of physician, (2) personal hardship alone does not constitute undue hardship under Karlin, and (3) defendant is capable of readily finding employment outside the restricted area.
Defendant contends that the trial court did not abuse its discretion in finding that the covenant would impose an undue hardship because it will preclude him from practicing in the heart of northern and central New Jersey where he and his family have deep and life-long ties.
According to defendant, he resides in Scotch Plains with his wife and three children and, with the exception of times he resided in other areas in connection with, for example, his education and medical training, he has lived in Union County all his life, as has his wife. His children attend public schools there and participate in soccer, baseball and hockey leagues, Cub Scouts, and summer day camp. He and his wife actively participate in and volunteer for scouting, athletics and community center activities. He has numerous family members and childhood friends residing in Union and Middlesex Counties and he feels it would be terribly disruptive, on a personal level, for both him and his family if they were forced to relocate their residence.
To determine whether a covenant imposes an undue burden, the court "should look to the likelihood of the employee finding work in his field elsewhere." Karlin, supra, 77 N.J. at 423, 390 A.2d 1161. Additionally, the Karlin Court found that the reason behind the termination was controlling, holding that:
The trial court should examine also the reason for the termination of the relationship between the parties to the employment contract. Where this occurs because of a breach of the employment contract by the employer, or because of actions by the employer detrimental to the public interest, enforcement of the covenant may cause hardship on the employee which may fairly be characterized as "undue" in that the employee has not, by his conduct, contributed to it. On the other hand, where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself.
[Id. at 423-24, 390 A.2d 1161.]
The Court further held that "personal hardship, without more," will not constitute undue hardship thereby preventing *484 enforcement of the covenant. Id. at 424, 390 A.2d 1161.
We have held that a restrictive covenant causes undue hardship "if it places substantial limitations on where an employee may work or if it prevents an employee from engaging in his or her livelihood." Maw v. Advanced Clinical Communications, Inc., 359 N.J.Super. 420, 436-37, 820 A.2d 105 (App.Div.2003). We stated in Maw:
To determine whether the hardship is undue, consideration is given to the nature of the profession, the duration of the restriction, the geographic area of the restriction and the type of restriction. Factors include, but are not limited to, (1) the agreement's geographic and temporal scope; (2) whether the types of activities restrained are those which would place the employee in actual competition with the former employer; and (3) whether the covenant will unduly burden the employee in finding work in his or her field.
[Id. at 437, 820 A.2d 105 (citations omitted).]
We conclude that the trial court erred as a matter of law in finding that enforcement of the covenant would impose undue hardship on defendant. First, the evidence demonstrates defendant's ability to find work outside of the geographically restricted area. It was revealed during defendant's deposition taken on October 16, 2002, that he was offered employment outside the restricted area but did not pursue several employment opportunities outside that area.
Additionally, it was defendant who initiated his termination of employment with plaintiff. Defendant's resignation letter explains that he has "outgrown the Institute's current model" and wishes to "test the waters of a more independent form of practice." This letter tends to illustrate that any hardship resulting from enforcement of the covenant was personal and self-induced. See Karlin, supra, 77 N.J. at 423-24, 390 A.2d 1161 (suggesting that a court should resist finding undue hardship where such hardship was brought on by actions of employee).
We must also address whether (1) the covenant's geographic and temporal scope are reasonable, (2) defendant will be in competition with plaintiff, and (3) the covenant unduly burdens defendant in finding employment in his field. See Maw, supra, 359 N.J.Super. at 437, 820 A.2d 105. We thus consider whether a two-year restriction is reasonable to protect plaintiff's interests. In Karlin, the Court held:
While a longer restriction may be permissible in medical specialties where the number of contacts between the physician and patient are relatively infrequent, the covenant should not be enforced beyond the period needed for the employer (or any new associate he may have taken on) to demonstrate his effectiveness to the patients.
[77 N.J. at 423, 390 A.2d 1161.]
It appears reasonable to conclude that a medical specialty such as neurosurgery would involve a need for a longer term of protection for an employer. Additionally, covenants containing a two-year period of restriction have generally been upheld as reasonable by our courts. See, e.g., Schuhalter v. Salerno, 279 N.J.Super. 504, 653 A.2d 596 (App.Div.), certif. denied, 142 N.J. 454, 663 A.2d 1361 (1995) (covenant restricting accounting partners from servicing each other's clients for two years found reasonable and enforceable); A.T. Hudson & Co., Inc. v. Donovan, 216 N.J.Super. 426, 524 A.2d 412 (App.Div. 1987) (covenant restricting principal from soliciting business from consulting firm for two years held enforceable); Mailman, *485 Ross, Toyes & Shapiro v. Edelson, 183 N.J.Super. 434, 441, 444 A.2d 75 (Ch.Div. 1982) (finding that two-year restrictions are generally reasonable). Accordingly, the two-year restriction on defendant's practice does not appear to work an undue hardship on defendant. We use two years as the agreed time period because, although we are cognizant of the "one (2) year" inconsistency in the agreement, we conclude that plaintiff is likely to prevail on the duration issue.
We must next determine whether a geographic restriction of thirty miles as contained in the covenant is enforceable. A restrictive covenant will not be enforceable beyond the area necessary to protect the employer's practice. Karlin, supra, 77 N.J. at 423, 390 A.2d 1161. Under the "blue pencil" rule, geographic areas and time restrictions which exceed the boundaries necessary to protect the employer may be modified by the court. Karlin, supra, 77 N.J. at 421, 390 A.2d 1161; Solari Indus., Inc., supra, 55 N.J. at 585, 264 A.2d 53.
We are persuaded that the thirty-mile restriction on defendant's practice is reasonable under the facts presented. Among other evidence on the point is that patients travel thirty miles or more to seek specialized care, of which neurosurgery is an example. Our state is characterized by great mobility as well as compactness. Over seventeen percent of plaintiff's current patients reside outside a thirty-mile radius from plaintiff's location, moreover. Because neurosurgery is considered a specialty, it is reasonable to conclude that plaintiff must draw its patient base from a larger geographic area than a general practitioner would. This is due in large part to restrictions on where these types of surgeries can be performed. We thus conclude that the thirty-mile restriction here is not unreasonable.
In order for the restrictive covenant to be held enforceable, it must restrict only those activities which are in competition with the employer. Karlin, supra, 77 N.J. at 423, 390 A.2d 1161. Here, defendant contends that its practice is not in competition with the services plaintiff offers. Defendant has failed to explain, however, how his practice of neurosurgery does not compete with plaintiff's. It appears that defendant bases this contention on the fact that plaintiff is the only institute in New Jersey which performs "Gamma Knife" surgeries. He asserts that these types of procedures are not normally performed by neurosurgeons in private practice without access to the necessary equipment. This contention must fail because such a fine line distinction could not have been intended by the Court in Karlin. We conclude that defendant is in competition with plaintiff.
The last issue we address under the undue hardship prong is whether the restrictive covenant unduly burdens defendant in finding employment in his field. See Maw, supra, 359 N.J.Super. at 437, 820 A.2d 105. As noted above, defendant was offered employment outside of the restricted area and also has not pursued several employment opportunities outside the thirty-mile radius. During defendant's deposition, he admitted to being offered employment at a hospital in Pennsylvania. Additionally, defendant conceded that he did not consider obtaining employment at several hospitals outside the restricted area, such as Hackensack Hospital, Holy Name Hospital, and Meadowlands Hospital. We conclude that plaintiff satisfied its burden of showing that enforcement of the restrictive covenant would not have unduly burdened defendant in finding employment in his field. Accordingly, plaintiff met its burden under the second prong of Karlin and we discern no hardship to defendant *486 that should prevent the issuance of injunctive relief if plaintiff is otherwise entitled thereto.

(E)
Regarding the public interest prong of Karlin, the trial court stated "that this question must be resolved or this item favors the defendant as opposed to plaintiff." The controlling issue here is "the demand for services rendered by the employee and the likelihood that those services could be provided by other physicians already practicing in the area." Karlin, supra, 77 N.J. at 424, 390 A.2d 1161. Karlin held:
If enforcement of the covenant would result in a shortage of physicians within the area in question, then the court must determine whether this shortage would be alleviated by new physicians establishing practices in the area. It should examine also the degree to which enforcement of the covenant would foreclose resort to the services of the "departing" physician by those of his patients who might otherwise desire to seek him out at his new location. If the geographical dimensions of the covenant make it impossible, as a practical matter, for existing patients to continue treatment, then the trial court should consider the advisability of restricting the covenant's geographical scope in light of the number of patients who would be so restricted.
[Ibid.]
The Court acknowledged that enforcement of a geographic restriction will often result in some patients having to travel farther distances. Id. at 419, 390 A.2d 1161. It held, however, that such geographic restrictions may nonetheless be enforceable since these patients are not deprived of the opportunity to continue their relationship with the departing physician. Ibid.
Plaintiff contends that the trial court erred in finding that enforcement of the restrictive covenant would be injurious to the public because (1) patient choice is not restricted by the covenant, (2) there are five other hospitals that provide neurosurgical care within the restricted area, and (3) the covenant would not prevent patients access to other neurosurgeons at SMC, where defendant is currently performing neurosurgeries.
Defendant argues that the trial court did not abuse its discretion in finding that enforcement of the covenant would adversely affect the public interest because there is a shortage of qualified neurosurgeons within the restricted area. In support of this contention, defendant submits the certifications of four neurosurgeons which assert "there is a high demand in the North and Central New Jersey region for qualified neurosurgeons...." Defendant proposes that this shortage is due to "tremendous entry barriers" in this specialty and also the fact that "years of education, practical experience and accumulated skills and knowledge" are required to become a qualified neurosurgeon.
While an issue exists as to whether there is a sufficient number of neurosurgeons within the restricted area, plaintiff met its burden, for purposes of the present application, of showing that enforcement of the covenant pending trial would not be injurious to the public interest. During his deposition, defendant himself admitted that the five hospitals that provide neurosurgery within the restricted area are not lacking in qualified neurosurgeons. The exchange was as follows:
Q: Does Hackensack University Medical Center have employee neurosurgeons on staff?
A: As far as I know.
*487 Q: They have a sufficient number of surgeons that are available to do these surgeries?
A: I believe so.
Q: Given the fact that we have all of these extensive programs, within this 30 mile radius of JFK and JFK itself, would youis it your view that there is a shortage of neurosurgeons within that 30 my [sic] radius?

....
A: Each one of these five institutions appears to be [sic] a sufficient number of neurosurgeons to cover.

....
Q: As I understand it, the JFK Institute is in some respects comparable to all five of these institutions, correct?
A: Correct.
Q: That gives us six institutions within this 30 mile radius that has [sic] the capacity to provide the kind of extensive neurological services that you referred to here in your supplemental certification?
A: Correct.
This evidence provides strong corroboration for plaintiff's contention that, with six hospitals having qualified neurosurgeons on staff within the restricted area, enforcement of the covenant would not restrict the public's access to other qualified neurosurgeons within that area.
In addition to determining whether a shortage of qualified neurosurgeons in the restricted area will result, we must also consider the degree, if any, to which defendant's patients would be burdened in continuing their relationship with him. See Karlin, supra, 77 N.J. at 424, 390 A.2d 1161. The restrictive covenant here does not restrict defendant's patients from continuing their relationships with defendant. Rather, defendant's contention that enforcement of the covenant would be adverse to the public's interest rests upon the thirty-mile geographic restriction. This contention must, however, be considered in light of the Court's declaration that the burden of traveling an increased distance does not, as a matter of law, automatically deprive defendant's patients from seeking treatment from him. Id. at 419, 390 A.2d 1161. Further, because neurosurgery is a specialty "where the number of contacts between the physician and patient are relatively infrequent," a larger geographic restriction appears to be less onerous on the public. It does not appear that enforcement of the covenant will be injurious to the public by preventing defendant's patients from receiving treatment from him.
We consider finally the impact on plaintiff and other similarly situated institutions that will result if these types of post-employment covenants are not enforced. The impact weighs strongly in favor of plaintiff. As defendant asserts, there are substantial entry barriers in the field of neurosurgery, which requires "years of education, practical experience and accumulated skills and knowledge" in order for one to become qualified.
It is uncontroverted that in 1994 defendant joined plaintiff fresh from his residency program, without a patient following. Therefore, if plaintiff is unable to protect its significant investments in physicians such as defendant, it stands to reason that any present shortage of neurosurgeons will only be exacerbated. The Court in Karlin seemingly referred to this effect when it held:
As has been noted plaintiff, through considerable effort and expenditure, has developed a sizeable practice. Defendant, who prior to his association with plaintiff had no contact whatsoever with the area *488 in question, has utilized the relationships he developed with patients while employed by plaintiff as a foundation for a growing practice located a few hundred feet from his former employer. Adoption of a Per se rule, however, would give the employing physician little, if any, protection in this situation. Aside from the inequity of not allowing a physician to protect himself, adoption of the Per se rule would tend to make established physicians hesitant to employ younger associates and in turn deprive the younger physician of the opportunity to gain experience and to husband the necessary resources needed to establish a practice of his own.
[77 N.J. at 422, 390 A.2d 1161.]
Accordingly, at this juncture enforcement of the covenant would not appear injurious to the public interest. Plaintiff has satisfied the requirements of Karlin and met its burden as to the likelihood of success on the merits under Crowe.

(F)
Plaintiff contends that the "overwhelming majority of states have ruled" that restrictive covenants among physicians are enforceable if found to be reasonable. Further, plaintiff asserts that courts in states such as Tennessee, Illinois, and West Virginia uniformly enforce restrictive covenants in favor of hospital employers and in accordance with our Supreme Court, states such as Oregon, Arizona, and Virginia have "rejected arguments that the ethical opinions of the AMA or state medical societies foreclose enforcement."
We find it supportive of plaintiff's position that the majority of states have declined to find restrictive covenants among physicians to be per se unenforceable. Several states, moreover, such as Colorado, Delaware, Massachusetts, Alabama, and North Dakota, have enacted statutes prohibiting restrictive covenants among physicians. Our Legislature by contrast has not enacted a similar statute, which may indicate legislative approval of restrictive covenants between physicians and, therefore, lend support to plaintiff's argument that the covenant here should be enforced.
Defendant has urged us to conclude that "recent ethical pronouncements by the American Medical Association [AMA] strongly condemning post-employment restrictive covenants involving physicians... are a strong indication that it may be appropriate for the Supreme Court to reconsider its holding in Karlin," and has provided copies of certain AMA materials. We disagree that these materials support his argument. They condemn, as does the law, restrictive covenants that are "excessive in geographic scope or duration in the circumstances presented, or if they fail to make reasonable accommodation of patients' choice of physician." The Supreme Court in Karlin distinguished legally-binding strictures on attorneys' practice from professional guidelines for physicians in explaining why restrictive covenants among attorneys were not enforceable whereas those among doctors were. The present form of these AMA guidelines cited by defendant provides no impetus for us to conclude that the Supreme Court will repudiate its rationale in Karlin.

(G)
We also consider whether a balancing of the equities favors the granting of injunctive relief. Crowe, 90 N.J. at 134, 447 A.2d 173. There was no express finding by the court below as to this criterion. Plaintiff contends that this balance tilts in favor of it when comparing its "substantial investment of time, money and other resources" in meeting its mission goals against defendant's "desire *489 to convert that investment for personal profit." Plaintiff reiterates its contention that although it is a not-for-profit institution, it relies on revenue to support its clinical, teaching, and research programs. Defendant argues that a balancing of the equities favors him because a qualified neurosurgeon would be prevented from practicing in an area where sixty-one percent of the state's population resides.
We are satisfied that plaintiff is exposed to greater detriment if preliminary relief is withheld than defendant would suffer if it is granted. Defendant's argument seemingly ignores both his and his patients' ability to travel readily outside the thirty-mile radius. Plaintiff's exposure to potential harm if the covenant is held unenforceable is great. Any further erosion of either plaintiff's patient or referral base affects its future capacity to support its programs, one of which defendant benefited greatly from. Additionally, the manner in which plaintiff makes future investments in newly-licensed physicians is affected by its capacity to protect those investments. Accordingly, the final prong of the Crowe standard weighs in favor of plaintiff.

V
We thus conclude that the trial court erred as a matter of law in finding that plaintiff failed to meet its burden for preliminary injunctive relief under the four-prong test established in Crowe. Among other things, the court mistakenly applied its discretion under the likelihood of success on the merits prong by finding that plaintiff failed to satisfy the criteria for restrictive covenants between physicians under the Karlin standard.
We are satisfied that the evidence shows that plaintiff established its right to a preliminary injunction under the requirements of Crowe and Karlin. Accordingly, we reverse the order denying preliminary injunctive relief and direct the issuance of such relief.
Although we find for preliminary injunction purposes that defendant has begun the practice of neurosurgery in violation of the agreement, on the present record we do not find that he has induced or solicited plaintiff's patients or otherwise violated the requirements of the subject agreement. Nevertheless, we direct that the following relief be entered to provide plaintiff with complete and appropriate enforcement and remedies with respect to defendant's prohibited practice to the extent as may become warranted by further proofs.
Accordingly, in view of the foregoing we hereby direct the trial court to enter an order pursuant to R. 4:52-2, preliminarily enjoining defendant Jay More from: (a) engaging in the practice of neurosurgery, or any of its branches, within a thirty-mile radius of the plaintiff's headquarters in Edison; (b) inducing any patients of plaintiff to patronize any professional health care provider other than plaintiff; (c) accepting, or soliciting, referrals of patients from any entity, person, or persons with whom said defendant had a business relationship or from whom he had receive such referrals; (d) requesting or advising any patients of plaintiff to withdraw, curtail, or cancel patients' business with plaintiff; and (e) disclosing to any other person, firm, or corporation the names or addressees of any patients of plaintiff.
In order to facilitate orderly compliance therewith, we stay the foregoing restraints for fourteen (14) days from the filing of this opinion by the clerk.
We reverse and remand for further proceedings. We do not retain jurisdiction, and all further proceedings shall take place in the trial court, including with respect *490 to any issues regarding enforcement of the injunction and the duration of the restraints.