869 A.2d 884

THE COMMUNITY HOSPITAL GROUP, INC., T/A JFK MEDICAL CENTER, PLAINTIFF–RESPONDENT, v. JAY MORE, M.D. AND SOMERSET MEDICAL CENTER, DEFENDANTS–APPELLANTS, AND DR. JAMES CHIMENTI AND NEUROSURGICAL ASSOCIATES AT PARK AVENUE, DEFENDANTS.

Argued November 30, 2004—Decided April 5, 2005.

38

*Robert J. Conroy* argued the cause for appellant Jay More, M.D. (*Kern Augustine Conroy & Schoppmann* attorneys; *Mr. Conroy* and *R. Bruce Crelin*, on the briefs).

*James J. Shrager* argued the cause for appellant Somerset Medical Center (*Norris, McLaughlin & Marcus*, attorneys; *David R. Strickler*, on the briefs).

*Carmine A. Iannaccone* argued the cause for respondent (*Epstein, Becker & Green*, attorneys; *Jatinder K. Sharma, James P. Flynn* and *Lauren D. Daloisio*, on the briefs).

*Lawrence Downs* argued the cause for *amici curiae* The Medical Society of New Jersey, Union County Medical Society, Somer-

set County Medical Society and Middlesex County Medical Society.

*Kevin McNulty* argued the cause for *amicus curiae* New Jersey Hospital Association (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys).

*Thomas M. Toman, Jr.,* argued the cause for *amicus curiae* University of Medicine and Dentistry of New Jersey (*Genova, Burns & Vernoia,* attorneys; *Angelo J. Genova,* of counsel; *Mr. Toman* and *Michelle A. Brown,* on the brief).

Justice WALLACE delivered the opinion of the Court.

In this case and in the companion case of *Pierson v. Medical Health Centers, P.A.,* 183 *N.J.* 65, 869 *A.*2d 901, 2005 *WL* 767001 (2005), also decided today, we granted leave to appeal to re-examine the issue decided in *Karlin v. Weinberg,* 77 *N.J.* 408, 390 *A.*2d 1161 (1978), that a post-employment restrictive covenant in an employment contract between physicians or between a physician and hospital is not *per se* unreasonable and unenforceable. Secondary to that issue, in this case, is whether, assuming *Karlin* has continuing vitality, the trial court erred in denying plaintiff's application for a preliminary injunction. The trial court denied relief, but the Appellate Division reversed and ordered temporary injunctive relief.

We reject the invitation to overrule *Karlin.* Instead, we hold that a restrictive covenant in an employment contract between a hospital and a physician is not *per se* unreasonable and unenforceable. We conclude, however, that under the circumstances of this case the geographic restrictive area is excessive and must be reduced to avoid being detrimental to the public interest.

I.

Plaintiff, the Community Hospital Group, also known as John F. Kennedy Medical Center (JFK) and the New Jersey Neuroscience Institute (Institute), is a not-for-profit hospital in Edison, Middlesex County, New Jersey. In 1992, JFK created the Institute, a

not-for-profit medical care provider specializing in the diagnosis and treatment of neurological diseases and neurosurgical conditions. The Institute receives the majority of its patients through referrals from physicians in other specialties.

On July 1, 1994, Dr. Jay More began to work as a neurosurgeon at the Institute following his residency at Mt. Sinai Hospital, in New York City. The initial employment agreement was for a one-year period beginning July 1, 1994, and ending June 30, 1995. The following year, Dr. More entered into a four-year agreement effective July 1, 1995, and in 1999, a five-year agreement effective July 1, 1999. Under the terms of the 1999 agreement, either party could terminate the agreement upon three hundred and sixty-five (365) days written notice to the other party. Critical to this appeal, each of the three employment agreements contained post-employment restrictive covenants that prohibited Dr. More from engaging in certain medical practices within a thirty-mile radius of JFK for two years.[1] The initial post-employment restrictive covenant contained in the 1994 agreement prohibited Dr. More from engaging in the practice of neurosurgery within a thirty-mile radius of JFK for a period of two years. The subsequent agreements were similar, but were expanded to prohibit Dr. More from engaging in any practice of medicine, not just neurosurgery.

The July 1, 1999 agreement, which was to run for a period of five years, is the contract that governs the dispute in this case. Article 7.14 of that agreement provided in part that

---

[1] The 1994 agreement stated that the duration of the restrictions respecting new employment was for "two (2) years" after termination. The 1995 and 1999 agreements stated that the duration of the restrictions was for "a period of *one* (2) years." (Emphasis added.) JFK contends that the reference in those provisions to "one" year is clearly a typographical error. Dr. More does not concede that these covenants have a two-year duration. We note that all three agreements contained additional restrictions for periods of two years on any attempts by Dr. More to acquire JFK's patients, referrals, or staff for his subsequent practice. It appears the use of the word "one" was a mistake.

for a period of one (2)[sic] years following the date of termination of MORE's employment for any reason whatsoever, MORE shall not, directly or indirectly, own, manage, operate, control or be employed by, participate in or be connected in any manner with the ownership, management, operation or control of any medical practice, nor engage in the practice of medicine, in any of its branches, within a 30 mile radius of the HOSPITAL, providing the same or substantially the same medical care as the Services outlined in this agreement. In the event, and only in the event, that the HOSPITAL terminates this Agreement without cause, the HOSPITAL agrees to make two exceptions to this non-competitive covenant and thus permit MORE to practice neurosurgery in New York City, defined as and limited to Queens, Brooklyn, Manhattan, and the two general hospitals in Elizabeth, New Jersey. In the event that MORE terminates this Agreement without cause or either party terminates this agreement for cause, then the aforementioned exceptions do not apply.

During the term of this Agreement and for a period of two (2) years following the date of termination of MORE's employment for any reason whatsoever, MORE shall not, directly or indirectly, for his own account or for the account of others, induce any patients of the HOSPITAL to patronize any professional health care provider other than the HOSPITAL; canvas or solicit any business relationship from any patients of the HOSPITAL; directly or indirectly request or advise any patients of the HOSPITAL to withdraw, curtail, or cancel any patients' business with the HOSPITAL; or directly or indirectly disclose to any other person, firm or corporation the names or addresses of any patients of the HOSPITAL.

Dr. More further agreed that he would not solicit or induce any employee of JFK to leave his or her employment for a two-year period and that the post-employment restraints were reasonable. Another provision in the agreement provided that in the event of a breach, JFK would suffer irreparable harm and damage and would be entitled to injunctive relief to enforce the post-employment restraints.

JFK agreed to pay Dr. More the base annual salary as set forth in the agreement. In addition, JFK bore other costs associated with Dr. More's employment, including expenses associated with continuing education courses, costs related to keeping his medical licenses current, $25,000 annually in medical malpractice insurance, tuition reimbursement, and reimbursement for numerous business related expenses. Dr. More developed a patient referral base and his surgical practice increased each year. On occasion, he was the featured speaker at seminars and programs sponsored by the Institute aimed toward obtaining referral sources.

On July 17, 2001, Dr. More submitted his letter of resignation to JFK, effective July the following year, stating that "the [Institute's] restrictive environment has become increasingly difficult to work in," and that he had "outgrown the Institute's current model." At some point, JFK notified Dr. More that it intended to enforce its rights as contained in the 1999 agreement.

Dr. More ceased working at JFK on July 17, 2002. He had received offers to join other practices that were located beyond the thirty-mile restrictive area, but declined each one. Between the date of his notice of resignation and his separation date, Dr. More removed documents from the Institute identifying patients' names and addresses, as well as the identity and location of the Institute's referral sources.

On July 22, 2002, Dr. More affiliated with another neurosurgeon, James M. Chimenti, M.D., as an employee of Neurosurgical Associates at Park Avenues, P.A. (NAPA), located at 1111 Park Avenue, Plainfield, New Jersey. In addition to joining NAPA, Dr. More also received medical staff privileges at Somerset Medical Center (Somerset), which is located approximately thirteen and a half miles from JFK. At the time Dr. More joined NAPA, Dr. Chimenti was the only neurosurgeon taking emergency room calls at Somerset. Dr. Chimenti had been searching for over eight months for an experienced, board-certified neurosurgeon to join his practice, but until Dr. More became available he was not able to locate a suitable candidate because of the shortage of experienced, skilled neurosurgeons in the area. With the addition of Dr. More to the medical staff, Somerset was able to provide complete neurological coverage through the two neurosurgeons.

On August 15, 2002, JFK wrote Dr. More that Somerset had inquired about his application for medical privileges at Somerset. JFK sought written assurance from Dr. More that he had not and did not intend to violate the agreement. Dr. More replied that he had not breached any lawfully enforceable employment agreement with the Institute.

Believing that Dr. More was in violation of the agreement, on September 6, 2002, JFK filed a complaint against Dr. More, seeking among other things a preliminary injunction prohibiting him from the practice of neurosurgery with NAPA or Somerset. On November 21, 2002, the trial court denied JFK's request for a preliminary injunction, established a discovery timetable, and set trial for May 12, 2003. The court found that JFK could not show a reasonable likelihood of success because it could not demonstrate that the covenant protected a legitimate interest of JFK, or that such an interest would not be outweighed by undue hardship to Dr. More, or that the covenant would not impair the public interest. JFK's motion for leave to appeal was denied by the Appellate Division on January 8, 2003.

While JFK's motion for leave to appeal to us was pending, JFK was granted leave to file an amended complaint adding Somerset as a defendant. JFK sought damages and injunctive relief against Somerset because Somerset had granted Dr. More privileges to practice at Somerset.

Eventually, we granted JFK leave to appeal and summarily remanded the matter to the Appellate Division to consider the appeal on its merits. *Cmty. Hosp. Group, Inc. v. More*, 176 *N.J.* 70, 819 *A.*2d 1186 (2003). In a published opinion dated December 29, 2003, the Appellate Division reversed the trial court and awarded JFK injunctive relief. *Cmty. Hosp. Group, Inc. v. More*, 365 *N.J.Super.* 84, 838 *A.*2d 472. The panel applied the four-prong test of *Crowe v. De Gioia*, 90 *N.J.* 126, 447 *A.*2d 173 (1982), for determining whether injunctive relief should be granted. The court found irreparable harm because a later award of damages would not enable JFK to satisfy its goal of providing clinical care, education, and research in the field of neurology. *Id.* at 99–100, 838 *A.*2d 472. The panel concluded that the trial court misapplied the *Karlin* standard in examining the restrictive covenant. *Id.* at 100–01, 838 *A.*2d 472.

The panel applied the three-part test for determining the reasonableness of the restrictive covenant, i.e. "whether the covenant

in question protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Id.* at 97, 838 *A.*2d 472 (quoting *Karlin, supra,* 77 *N.J.* at 422, 390 *A.*2d 1161)(internal quotations omitted). The panel found that the evidence supported the conclusion that the restrictive covenant was necessary to protect JFK's patient and referral relationships. *Id.* at 102, 838 *A.*2d 472. After rejecting the trial court's conclusion to the contrary, the panel determined that JFK satisfied its burden of showing that enforcement of the restrictive covenant would not impose an undue hardship on Dr. More. *Id.* at 104, 838 *A.*2d 472. In that regard, the panel noted there was sufficient evidence that Dr. More could find work outside of the geographically restricted area, and that any hardship upon Dr. More was personal and self-induced. *Ibid.* The panel found the two-year period of the restriction was reasonable and consistent with other restrictions that have been upheld. *Id.* at 105, 838 *A.*2d 472.

The panel then addressed the reasonableness of the thirty-mile geographic restriction. *Ibid.* After finding that some patients traveled thirty miles or more to seek specialized care such as neurosurgery and that over seventeen percent of JFK's patients resided outside of the thirty-mile radius, the panel concluded that the scope of the restriction was reasonable. *Id.* at 106, 838 *A.*2d 472.

The panel next reviewed the crucial issue of the public interest prong of the *Karlin* test. *Id.* at 107, 838 *A.*2d 472. The panel stressed Dr. More's admission that five hospitals, aside from JFK, provided neurosurgery within the restricted area and did not lack qualified neurosurgeons, and as a result, enforcement of the restrictions would not have an impact on the public's access to other qualified neurosurgeons within that area. *Id.* at 109, 838 *A.*2d 472. In regard to Dr. More's patients living within the geographic area, the panel found the covenant did not restrict the patients from continuing their relationships with him, but merely forced the patients to visit Dr. More outside the restricted area.

*Id.* at 109–10, 838 *A.*2d 472. The panel directed the trial court to enter a preliminary injunction enjoining Dr. More from engaging in the practice of neurosurgery within a thirty-mile radius of JFK. *Id.* at 112–13, 838 *A.*2d 472.

We granted a stay of the Appellate Division decision on January 5, 2004, and on March 11, 2004, we granted Dr. More's and Somerset's motions for leave to appeal. 179 *N.J.* 304, 845 *A.*2d 131 (2004); 179 *N.J.* 305, 845 *A.*2d 131 (2004). We also granted *amicus curiae* status to the Medical Society of New Jersey and the New Jersey Hospital Association.

## II.

### A.

Dr. More argues that the restrictive covenant is unenforceable because it is against the public interest. He points out that since the death of Dr. Chimenti's partner in late 2001, Dr. Chimenti has been the only neurosurgeon providing on-call emergency service at Somerset. He further argues that if the Appellate Division's decision stands, Dr. Chimenti would once again be the only neurosurgeon providing on-call emergency service to Somerset, thus creating the potential for an emergency room patient to be denied necessary neurological services. Dr. More claims that precluding him from practicing within the restricted area, "removes a highly qualified, experienced neurosurgeon from practice, at the expense of New Jersey's citizens." Dr. More also argues that the Appellate Division ignored the evidence of the significant shortage of qualified neurosurgeons in the northern and central New Jersey areas.

Alternatively, Dr. More asks this Court to overrule *Karlin* and adopt a *per se* ban on restrictive covenants involving physicians. He urges that because the American Medical Association (AMA) now strongly disfavors post-employment restrictive covenants involving physicians and specifically regards them as unethical if they restrict a patient's choice of physician, this Court should treat

physicians like attorneys and impose a *per se* rule against such covenants.[2]

### B.

Like Dr. More, Somerset argues that enforcement of the restrictive covenant in this case will cause serious harm to the public interest. Somerset asserts that Dr. More played a major role in its emergency room on-call coverage, and the immediate public interest is served only if Dr. More remains on-call at Somerset. Further, Somerset notes that unlike in *Karlin,* where the patients could decide whether to travel to the physician's new office, accident or stroke victims in the vicinity of a hospital do not have that option. Somerset argues that the need for Dr. More to provide emergency room services outweighs any long-term investment interest of JFK.

In the alternative, Somerset joins Dr. More's argument that restrictive covenants involving physicians are *per se* invalid and unenforceable.

### C.

JFK asks this Court to affirm the decision of the Appellate Division. It argues that Dr. More will not suffer any undue hardship if this Court enforces the restrictive covenant. JFK notes that any harm suffered by Dr. More is financial in nature, that Dr. More received offers to practice in hospitals outside the thirty-mile radius but turned them down, and that he did not even seek to gain employment at one of the many New York hospitals located outside of the restricted area.

---

2 Dr. More also submitted a "Letter to Court After Brief Filed," in which he points to new federal regulations, codified at 42 *C.F.R.* § 411.357, that he claims are relevant to the issue in this case. He contends that the new regulations demonstrate that the federal government is about to outlaw the specific type of post-employment restrictive covenant that JFK seeks to impose against him. JFK disputes Dr. More's contentions. We express no view on the interpretation of those regulations and decide this case without regard to them.

JFK disagrees with Dr. More that enforcement of the covenant will result in harm to the public. JFK claims that Dr. More is not restricted from treating patients, rather he is restricted only from treating patients within the restricted area. While some patients would be inconvenienced with having to travel a longer distance to receive treatment from Dr. More, other patients would receive the benefit of traveling a shorter distance. JFK asserts that Dr. More's statements regarding a shortage of neurosurgeons in the restricted area are conclusory and have not been supported by any empirical or statistical evidence. Moreover, JFK contends that Dr. More falsely assumes without any evidential support that his services are in greater demand within a thirty-mile radius of JFK, as opposed to counties such as Bergen, Mercer, or others in this State, located outside of the thirty-mile radius. JFK also points out that Dr. More expressly admitted under oath that there were five institutions in addition to JFK within the thirty-mile radius that provided extensive neurosurgical care and each had a sufficient number of neurosurgeons. Further, JFK notes that there are a sufficient number of neurosurgeons within the restricted area who could provide emergency coverage to Somerset even if those doctors had to provide simultaneous on-call coverage to another hospital.

JFK argues that the Appellate Division correctly applied *Karlin,* and that Dr. More and Somerset have failed to provide any compelling reason why this Court should overrule *Karlin.* JFK notes that neither the AMA Ethical Guidelines, nor New Jersey statutes, nor the regulations of the State Board of Medical Examiners prohibit restrictive covenants in physician employment contracts. According to JFK, the reasonableness test espoused in *Karlin* is consistent with the AMA's guidelines for restrictive covenants.

JFK also argues that the thirty-mile restrictive covenant is necessary to protect its relationships with its referral sources who refer patients for specialized care in neurosurgical and neurological sub-specialties. Moreover, JFK claims that as a non-profit

teaching hospital, it relies heavily upon the revenue generated by patient services to support its clinical teaching and research development efforts.

### D.

### *Amicus Curiae*

1. **Medical Society of New Jersey, Union County Medical Society, Somerset County Medical Society, and Middlesex County Medical Society**

The Medical Society of New Jersey (MSNJ) is a large organization of physicians in New Jersey. The Union, Somerset, and Middlesex County Medical Societies are component societies of MSNJ. MSNJ's mission is to "promote the quality of New Jersey health care and health services for all citizens of the state through leadership and assistance to its physician members." MSNJ acknowledges that restrictive covenants within the medical profession are commonplace in physician-to-physician situations and serve the legitimate purpose of encouraging investment in new physicians while protecting the established physicians who hire them. The MSNJ also claims that this Court's holding in *Karlin* is consistent with the AMA's policy on restrictive covenants. MSNJ argues, however, that the restrictive covenant in this case is disruptive of patient care and should not be enforced.

MSNJ asserts that both the temporal and geographic scope of the restraints imposed are grossly excessive. Therefore, even if enforced, MSNJ urges that the covenant must be "blue penciled" [3] in order for it to be found reasonable.

2. **New Jersey Hospital Association**

The New Jersey Hospital Association (NJHA) serves the professional, public policy, educational and legal interests of its hospi-

---

[3] "Blue Penciled" refers to a court's partial enforcement of a restrictive covenant. As the Court stated in *Karlin, supra,* courts "may compress or reduce the geographical areas or temporal extent of their impact so as to render the covenants reasonable." 77 *N.J.* at 420 n. 4, 390 *A.2d* 1161.

tal and health system members. NJHA's members account for over ninety percent of the hospitals located in the State. NJHA argues that *Karlin* should be preserved because it incorporates the best interests of the medical profession, the public, and quality health care, and because the test is flexible enough to weigh public policy factors differently than in an ordinary commercial case.

NJHA asserts that restrictive covenants for physicians are distinguishable from attorneys' covenants in two significant ways. First, a restrictive covenant prohibits an attorney from having any relationship with a client whereas one involving a physician only restricts the location where the physician can have a relationship with the patient. Second, the Supreme Court has the responsibility for monitoring attorneys, whereas other institutions such as the AMA and the State Board of Medical Examiners regulate physician conduct.

NJHA adds that there is no legal rationale for distinguishing this case, which involves an agreement between a not-for-profit hospital and a physician, from *Karlin*, which involved an agreement between two physicians.

## III.

### A.

We turn first to the issue whether we should overrule *Karlin* and declare a *per se* rule voiding all restrictive covenants contained in the employment contracts of physicians. We begin with a discussion of *Karlin* and its underpinnings.

The plaintiff, Dr. Karlin, an established dermatologist hired the defendant, Dr. Weinberg, a new physician with no prior connections or training in New Jersey. *Karlin, supra,* 77 *N.J.* at 412, 390 *A*.2d 1161. The employment contract contained a provision that upon termination defendant was not to practice within a ten-mile radius for five years. *Ibid.* The defendant left and opened a practice on the same street. *Id.* at 413, 390 *A*.2d 1161. The

plaintiff filed suit against the defendant seeking to enforce the restrictive covenant in the agreement. *Ibid.*

In evaluating the covenant, Justice Clifford, writing for the majority, traced the prior restrictive covenant cases involving physicians, commercial business dealings, and attorneys. *Id.* at 415–420, 390 *A.*2d 1161. Citing *Solari Industries, Inc. v. Malady,* 55 *N.J.* 571, 576, 264 *A.*2d 53 (1970), and *Whitmyer Bros., Inc. v. Doyle,* 58 *N.J.* 25, 32–3, 274 *A.*2d 577 (1971), the Court declared that "[a] post-employment restrictive covenant will be found to be reasonable when it protects the 'legitimate' interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public[.]" *Id.* at 417, 390 *A.*2d 1161. Although acknowledging that a physician, like any other employer, has no legitimate interest in preventing competition, the Court found that the physician-employer has a legitimate interest in protecting ongoing relationships with patients. *Ibid.*

Next, the Court rejected the defendant's argument to extend to physicians the holding in *Dwyer v. Jung,* 133 *N.J.Super.* 343, 336 *A.*2d 498 (Ch.Div.1975), *aff'd, o.b.* 137 *N.J.Super.* 135, 348 *A.*2d 208 (App.Div.1975), that restrictive covenants among attorneys are unreasonable *per se* because they are injurious to the public as a matter of law. *Id.* at 418–19, 390 *A.*2d 1161. While endorsing the holding in *Dwyer,* the Court distinguished restrictive covenants among attorneys from those among physicians. *Id.* at 419, 390 *A.*2d 1161. First, the Court noted that in contrast to the restrictive covenant in *Dwyer,* which prohibited the attorney from "doing business" with any particular person, the covenant in *Karlin* only prohibited patients' access to the defendant in a certain geographical area. *Ibid.* Second, and most important, the Court found that "Dwyer represents an exercise by the judicial branch of its unique constitutional responsibility for regulating the conduct of attorneys", *ibid.,* in that the Supreme Court has exclusive responsibility to regulate the admission and discipline of attorneys whereas the State Board of Medical Examiners regulates physicians. *Id.* at 419–20, 390 *A.*2d 1161. The Court observed that "[n]either our

statutes nor the regulations of the State Board of Medical Examiners, which in regulating physicians ... serves a role similar to that of this Court in regulating attorneys, in any way restricts physicians from entering into restrictive covenants." *Id.* at 420–21, 390 *A.*2d 1161.[4]

The *Karlin* Court concluded that restrictive covenants between physicians are not *per se* unreasonable and unenforceable, and instead adopted the *Solari* test—"whether the covenant in question '... protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public.'" *Id.* at 422, 390 *A.*2d 1161 (quoting *Solari, supra,* 55 *N.J.* at 576, 264 *A.*2d 53). The Court also provided a non-exhaustive list of relevant factors to consider when determining the enforceability of restrictive covenants among physicians. *Id.* at 423, 390 *A.*2d 1161. Those factors include the time the employer-physician needs to rebuild the practice following the employee-physician's departure, the reasonableness of the geographic scope, whether the activities the departing physician is prohibited from engaging in are the same as those performed by the employer physician, the hardship on the employee and the reason for the departure, the likelihood that another physician in the area can provide the medical services left vacant by the departing physician and "the effect that enforcement of the covenant would have on the public interest." *Id.* at 423–24, 390 *A.*2d 1161.

Writing for three dissenters, Justice Sullivan argued that restrictive covenants involving physicians should be held *per se* invalid as against public policy because of the nature of the physician-patient relationship. *Id.* at 425, 390 *A.*2d 1161. He saw the same principles at work in the physician-patient relationships as in the attorney-client relationships. *Id.* at 427, 390 *A.*2d 1161.

---

4 Recently, in *Comprehensive Psychology System, P.C. v. Prince,* 375 *N.J.Super.* 273, 867 *A.*2d 1187 (2005), the Appellate Division held that the court was obligated to deny the enforceability of a restrictive covenant in an employee contract for professional services by a licensed psychologist because the Board of Psychological Examiners had adopted a rule that barred the same.

He observed, both "are consensual, highly fiduciary and peculiarly dependent on the patient's or client's trust and confidence in the physician consulted or attorney retained." *Ibid.* Justice Sullivan disagreed with the majority's characterization that *Dwyer* rested on the disciplinary rule and argued that the Court in *Dwyer* cited the rule to demonstrate the strength of the public policy weighing in favor of prohibiting the covenant. *Ibid.*

### B.

Since *Solari* and *Karlin,* the test for determining the validity of restrictive covenants between physicians and restrictive covenants in the commercial context has not changed. Dr. More and Somerset argue for a deviation from that approach, emphasizing the similarities between the attorney-client and physician-patient relationships as asserted by Justice Sullivan. They claim that the field of medicine has changed since 1978 when *Karlin* was decided and that the AMA has declared restrictive covenants unethical. Further, they argue that no reported case has recognized that a hospital or other similar entity has a legitimate interest in protecting existing patient relationships. Therefore, they ask this Court to conclude that hospitals have no legitimate interests in precluding a physician from practicing medicine.

Just as the decision in *Karlin* was difficult and close, the decision whether to continue the *Solari–Karlin* approach is difficult. Both sides mount strong arguments in favor of their respective positions. We recognize the importance of patient choice in the initial selection and continuation of the relationship with a physician. We also agree that the similarities between the attorney-client and physician-patient relationships are substantial. Notwithstanding those considerations, on the record before us we find insufficient justification to overrule *Karlin* and adopt a *per se* rule invalidating restrictive covenants between physicians or between a physician and a hospital.

The medical profession has accommodated the *Karlin* test for more than twenty-five years. The relationships among individual

physicians, medical practice groups, and hospitals in delivering healthcare are complex. An established rule that has governed those relationships for several decades should not be discarded unless we are reasonably certain that we have a problem in need of a cure. Further, the *Karlin* analysis includes a public interest component that we today emphasize. So long as the public interest takes precedence over private or parochial concerns, the plaintiff's arguments in support of a *per se* rule voiding restrictive covenants are less persuasive. On the current record, we cannot conclude that prohibiting restrictive covenants among physicians and hospitals will in fact advance the public interest.

Except for attorneys, *see Jacob v. Norris, McLaughlin & Marcus,* 128 *N.J.* 10, 27, 607 *A.*2d 142 (1992), and more recently, psychologists, *see Comprehensive Psychology System, P.C. v. Prince, supra,* 375 *N.J.Super.* 273, 867 *A.*2d 1187 (App.Div.2005), our courts have consistently utilized a reasonableness test to determine the enforceability of restrictive covenants. Contrary to Dr. More's and Somerset's contention, we find no logical justification to treat a hospital-employer differently from a physician-employer. If either the hospital-employer or the physician-employer cannot establish that it has a legitimate business interest and, most important, that enforcement of the restriction will not be injurious to patient care, then enforcement of the restriction should be denied.

## C.

We recognize that several commentators have criticized the distinction our law makes between physicians and attorneys in respect of restrictive covenants. *See* Paula Berg, *Judicial Enforcement of Covenants Not to Compete Between Physicians: Protecting Doctors' Interests at Patients' Expense,* 45 *Rutgers L.Rev.* 1, 36–37 (1992) ("The inconsistent judicial treatment of restrictive covenants between [attorneys and physicians] cannot be justified. Indeed, the philosophical and public policy underpinnings of the *per se* rule apply with greater force to restrictive

covenants between physicians than to restrictive covenants between attorneys"); Serena L. Kafker, *Golden Handcuffs: Enforceability of Noncompetition Clauses in Professional Partnership Agreements of Accountants, Physicians, and Attorneys*, 31 *Am. Bus. L.J.* 31, 56 (1993) ("The special trust patients place in their physicians merits as much if not more protection than that of the lawyer's client."); Arthur S. Di Dio, *The Legal Implications of Noncompetition Agreements in Physician Contracts*, 20 *J. Legal Med.* 457, 473 (1999) ("The public policy concern with restrictive covenants between attorneys is grounded in the sanctity of the attorney-client relationship. It is curious, if not completely illogical, that the same concern does not apply as forcefully to the physician-patient relationship and render restrictive covenants between physicians *per se* invalid as well.") Despite that criticism, we continue to rely on this Court's power to govern the ethical standards of the legal profession as justification for our decision to treat attorneys and physicians differently.

Notably, the AMA, which governs the ethical standards of the medical profession, does not declare restrictive covenants *per se* unethical. The AMA's pertinent rule provides:

Covenants-not-to-compete restrict competition, disrupt continuity of care, and potentially deprive the public of medical services. The Council on Ethical and Judicial Affairs discourages any agreement which restricts the right of a physician to practice medicine for a specified period of time or in a specified area upon termination of an employment, partnership or corporate agreement. Restrictive covenants are unethical if they are excessive in geographic scope or duration in the circumstances presented, or if they fail to make reasonable accommodation of patients' choice of physician.

[AMA, *E–9.02: Restrictive Covenants and the Practice of Medicine, available at* www.ama-assn.org/ama/pub/category/8519.html (last visited February 10, 2005).]

Although the AMA discourages restrictive covenants between physicians, it only declares them unethical if "excessive in geographic scope or duration, or if they fail to make reasonable accommodation of patients' choice of physician." *Ibid.* That is essentially the same reasonableness standard we apply under *Karlin. See also* Derek W. Loeser, *The Legal, Ethical, and Practical Implications of Noncompetition Clauses: What Physicians Should Know Before They Sign*, 31 *J.L. Med. & Ethics* 283,

287 (2003) (noting that E–9.02 "has limited legal impact" because it "merely parrots the reasonableness standard applied by most courts"). Thus, the AMA's ethical rules are consistent with, and not contrary to, the *Karlin* analysis.

Before us, *amici* support the case-by-case approach in *Karlin*, as contrasted to a *per se* rule. The briefs submitted by the MSNJ and the NJHA argue against the adoption of a *per se* rule banning restrictive covenants in employment contracts of physicians. The overwhelming majority of other states apply some type of reason-ableness test. *See* Ferdinand S. Tinio, Annotation, *Validity and Construction of Contractual Restrictions On Right of Medical Practitioner to Practice, Incident to Employment Agreement,* 62 *A.L.R.*3d 1014 (2004)(providing expansive discussion on treatment of restrictive covenants nationwide). *See also* Di Dio, *supra,* 20 *J. Legal Med.* at 476–77; Berg, *supra,* 45 *Rutgers L.Rev.* at 4–5.

In short, we continue to adhere to and follow the *Karlin* test because we conclude that it strikes the proper balance between an employer's and employee's freedom to contract on the one hand and the public interest on the other. In addition, we are con-vinced that the *Karlin* reasonableness test with emphasis on the public interest, is sufficiently flexible to account for varying factual patterns that may arise.

## IV.

We turn now to apply the principles of *Karlin* that are "now known as the *Solari/Whitmyer* test[,] for determining whether a noncompete agreement is unreasonable and therefore unenforceable." *Maw v. Advanced Clinical Communications, Inc.,* 179 *N.J.* 439, 447, 846 *A.*2d 604 (2004). That test requires us to determine whether (1) the restrictive covenant was necessary to protect the employer's legitimate interests in enforcement, (2) whether it would cause undue hardship to the employee, and (3) whether it would be injurious to the public. *Karlin, supra,* 77 *N.J.* at 417, 390 *A.*2d 1161. Depending upon the results of that analysis, the restrictive covenant may be disregarded or given

complete or partial enforcement to the extent reasonable under the circumstances. *Whitmyer, supra,* 58 *N.J.* at 32, 274 *A.*2d 577.

### A.

■ The first prong of the test requires us to consider whether the covenant protects the legitimate interests of JFK. Those legitimate interests may include: (1) protecting confidential business information, including patient lists; (2) protecting patient and patient referral bases; and (3) protecting investment in the training of a physician. *See* Di Dio, *supra,* 20 *J. Legal Med.* at 458–61. JFK, like every other employer, however, does not have a legitimate business interest in restricting competition.

■ In this case, the evidence established that JFK made a substantial investment in Dr. More by giving him the opportunity to accumulate knowledge and hone his skills as a neurosurgeon. Indeed, Dr. More acknowledges that it "takes years of education, practical experience and accumulated skills and knowledge, as well as an innate talent, for a doctor to reach [his] level of practice." Further, Dr. More admitted he removed patient and patient referral lists from JFK between the time of his resignation and his eventual departure from JFK. It was also undisputed that many of the patients Dr. More treated after joining NAPA and Somerset were once patients of JFK or were referred to Dr. More from one of JFK's referral sources. Further, in addition to training Dr. More, JFK paid for his attendance at seminars and other events, and paid for his malpractice insurance as well. In short, we agree with the Appellate Division's conclusion that JFK established that it had several legitimate protectable interests in enforcement of the restriction.

■ Beyond that, three additional factors should be considered in determining whether the restrictive covenant is overbroad: its duration, the geographic limits, and the scope of activities prohibited. Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employ-

er's interests. *Karlin, supra,* 77 *N.J.* at 423, 390 *A.*2d 1161. Although recognizing that "a longer restriction may be permissible in medical specialties where the number of contacts between the physician and patient are relatively infrequent," the *Karlin* Court emphasized that "the covenant should not be enforced beyond the period needed for the employer (or any new associate he may have taken on) to demonstrate his effectiveness to the patients." *Ibid.*

■ Here, the restrictive covenant was for a period of two years and sought to prevent Dr. More from engaging in the practice of neurosurgery within a thirty-mile radius of JFK. Dr. More was employed by JFK for approximately eight years. On its face two years appears to be a reasonable period for JFK to replace and train a person to assume Dr. More's prior role. Moreover, JFK only sought to prohibit Dr. More from the practice of neurosurgery. That single restriction was not overbroad. We will discuss the thirty-mile radius restriction below in conjunction with the harm to the public prong of the test. Aside from the geographic limitation, we are satisfied that JFK demonstrated that it has legitimate business reasons for enforcing the restrictive covenant.

## B.

■ The second prong requires that the restrictive covenant impose no undue hardship on the employee. That inquiry requires the court to determine the likelihood of the employee finding other work in his or her field, and the burden the restriction places on the employee. *See Karlin, supra,* 77 *N.J.* at 423, 390 *A.*2d 1161. In applying this part of the test, the reason for the termination of the parties' relationship is also relevant. If the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play. On the other hand, where the employer causes the parties to separate, "enforcement of the covenant may cause hardship on the employee which may fairly be characterized as 'undue' in that the employee has not, by his conduct, contributed to it." *Ibid.*

■ It is evident that Dr. More is a highly qualified neurosurgeon and his services are in demand. He received substantial offers from across the country. Although there may be some additional burden as a result of a longer commute, Dr. More need not uproot his family to practice outside the restricted area. Further, as Dr. More voluntarily resigned and brought any hardship upon himself, that hardship is not an impediment to enforcement of the restriction. We are convinced that JFK satisfied the second prong and demonstrated that enforcement of the restriction would not impose an undue hardship upon Dr. More.

## C.

■ The final prong of the test is that enforcement of the restriction should not cause harm to the public. *Karlin, supra,* 77 *N.J.* at 424, 390 *A.*2d 1161. The impact a covenant not to compete in the medical field may have on the public is of critical importance. In each case, the varying circumstances must be considered in the effort to evaluate that impact. Justice Clifford's guidance in *Karlin* bears repeating:

> Significant here is the demand for the services rendered by the employee and the likelihood that those services could be provided by other physicians already practicing in the area. If enforcement of the covenant would result in a shortage of physicians within the area in question, then the court must determine whether this shortage would be alleviated by new physicians establishing practices in the area. It should examine also the degree to which enforcement of the covenant would foreclose resort to the services of the 'departing' physician by those of his patients who might otherwise desire to seek him out at his new location. If the geographical dimensions of the covenant make it impossible, as a practical matter, for existing patients to continue treatment, then the trial court should consider the advisability of restricting the covenant's geographical scope in light of the number of patients who would be so restricted.
>
> [*Id.* at 424, 390 *A.*2d 1161.]

As noted, the geographical restriction in this case is a thirty-mile radius of JFK or a sixty-mile distance from the farthest points on the radius. Dr. More and Somerset presented evidence to ˚show that preventing Dr. More from practicing within the thirty-mile radius will be injurious to the public because there is a shortage of neurosurgeons in that area. Dr. Nossratollah Hoosh-

angi, president of the Medical–Dental Staff, president of the Medical–Executive Committee, and Chief of the Division of Neurosurgery at JFK, stated in his certification that Middlesex and Union counties were suffering from a shortage of qualified neurosurgeons. Dr. Edward Von Der Schmidt, president of the New Jersey Neurosurgery Society, certified that there is a "significant shortage of neurosurgeons in the State of New Jersey, in general, and in the Middlesex Union/Somerset County areas." Dr. Hartmann, on behalf of Somerset, certified that Dr. More's services are badly needed at Somerset Medical Center, and that granting injunctive relief to JFK would pose serious harm to the public served by Somerset. Dr. Chimenti certified that because he and Dr. More were the only two neurosurgeons available to provide emergency coverage at Somerset, if Dr. More were prohibited from maintaining his present practice, neurosurgical treatment and evaluation in the emergency room at Somerset Medical Center would be dangerously compromised.

The Appellate Division nevertheless concluded that the covenant would not appear injurious to the public interest. The panel found that because six hospitals in the area, including JFK, have qualified neurosurgeons, "enforcement of the covenant would not restrict the public's access to other qualified neurosurgeons within that area." *Cmty. Hosp., supra,* 365 *N.J.Super.* at 108–10, 838 *A.*2d 472. The panel reasoned that the burden on patients having to travel an increased distance did not automatically prevent Dr. More's patients from seeking treatment from him. *Id.* at 109, 838 *A.*2d 472.

Unfortunately, the panel failed to focus on the adverse impact the geographic restriction would have on neurological patients seeking treatment at Somerset's emergency room. Without Dr. More, Somerset's ability to provide necessary neurological treatment to an emergency room patient could be compromised. Moreover, the panel appeared to consider only patients who had the ability to travel beyond the restrictive area to visit Dr. More, and did not address those patients needing emergency neurologi-

cal care in the area of Somerset or those patients who might not have the ability to travel beyond the large restricted area.

The evidence was overwhelming that prohibiting Dr. More from attending to neurological patients in Somerset's emergency room would be injurious to the public interest. A number of out-of-state-cases have found that similar evidence invalidated a restrictive covenant. *See, e.g., Duneland Emergency Physician's Med. Group v. Brunk,* 723 *N.E.*2d 963, 966–67 (Ind.Ct.App.2000)(finding restrictive covenant unenforceable if it prevents physician from providing care to emergency room patients); *Premier Health Care Services, Inc. v. Schneiderman,* 2001 *WL* 1658167 at *11 (Oh.Ct.App. Dec. 28, 2001) (finding former employer's interest substantially outweighed by upheaval in medical care in hospital's emergency centers and therefore public interest weighs against granting of injunction); *Emergicare Sys. Corp. v. Bourdon,* 942 *S.W.*2d 201, 204 (Tex.Ct.App.1997)(finding restrictive covenant unenforceable because it prevented doctor from continuing to serve public as emergency doctor). Because the geographic restricted area encompassed an area plagued with a shortage of neurosurgeons, the Appellate Division should have decreased the geographical limitation of the covenant. When it is reasonable to do so, courts should not hesitate to partially enforce a restrictive covenant. *Karlin, supra,* 77 *N.J.* at 420 n. 4, 390 *A.*2d 1161.

Somerset is located approximately thirteen miles from JFK and therefore is included in the restricted area. We are satisfied that if the covenant were limited to a distance less than thirteen miles so that Somerset was not within the restricted area, the covenant would not have the same adverse impact on the public that it presently has. A remand is necessary for the Chancery Division to determine the precise limits of the geographic area of the restriction, but in no event should it exceed thirteen miles or include Somerset.

Our dissenting colleague points to the language of the restrictive covenant in which the parties agree that the terms are

"reasonable." Because Dr. More "voluntarily signed" three separate covenants containing that language, the dissent concludes that the doctor's actions "deserve our condemnation." *Post* at 64–65, 869 *A*.2d at 901. Although acknowledging that "equitable considerations are paramount," (*post* at 65, 869 *A*.2d at 901) when the validity of a restrictive covenant is at issue, the dissent disregards that principle, and instead, chastises Dr. More. We are satisfied that the interests of patients at Somerset who need emergent neurological care come first, and should not be put aside because Dr. More disregarded the terms of his agreement with JFK.

## V.

Finally, we note that under JFK's interpretation of the agreement the two-year period for the term of the restrictive covenant was to run from July 17, 2002, until July 17, 2004. That period has expired. Because restrictive covenants are not favored in the law, we find no justification to extend the agreement beyond that period. Plaintiff, of course, may press its claim for damages for the period prior to July 17, 2004.

## VI.

In summary, we conclude that the test enunciated in *Karlin, supra*, is a fair, workable solution to the competing interests of the hospital and the physician. Although post-employment restrictive covenants are not viewed with favor, if under the circumstances a factual determination is made that the covenant protects the legitimate interests of the hospital, imposes no undue hardship on the physician and is not injurious to the public, it may be enforced as written or, if appropriate, as reduced in scope. Here, except for the geographic scope of coverage, the restrictive covenant was fair. Considerations of the potential adverse impact on the public dictate that the geographic scope must be reduced. Because the two-year period for the restrictive covenant has expired, JFK's request for injunctive relief is moot. JFK's claim

is limited to damages, including but not limited to the loss of patients, as a result of Dr. More's departure.

The judgment of the Appellate Division is affirmed in part and reversed in part. We remand to the Chancery Division for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

Today we reaffirm *Karlin v. Weinberg,* 77 *N.J.* 408, 390 *A.*2d 1161 (1978), and hold that "a restrictive covenant in an employment contract between a hospital and a physician is not *per se* unreasonable and unenforceable." *Ante,* 183 *N.J.* at 41, 869 *A.*2d at 887. I join the Court in so holding.

However, to the extent the Court also "blue pencils" the restrictive covenant at issue here in a manner that renders it meaningless, I must respectfully dissent. Circumscribing the geographic limits of the restrictive covenant so as to place the very conduct prohibited by the restrictive covenant tantalizingly outside the restrictive covenant's reach gives the party that successfully sought to enforce the restrictive covenant nothing more than a Pyrrhic victory. There can be no question that considerations of patient care are critically important in the judicial calculus of whether a restrictive covenant is injurious to the public. However, the conduct of the restricted physician here in singling out the one hospital most convenient to his personal preferences that also has a need for his medical specialty as his justification for violating a restrictive covenant he voluntarily signed three different times over a five-year period—and ignoring all other alternatives that would not have violated the covenant he freely and voluntarily entered into with the hospital employer that allowed him to develop his expertise in the first instance—is little more than rank bootstrapping. This is even more so because the employment agreement this physician voluntarily signed contained his representation that the terms of the restrictive covenant

(i) ... are necessary and appropriate for the reasonable protection of [plaintiff's] interests; (ii) *each and every covenant and restriction is reasonable in respect to its* subject matter, length of time and *geographical area;* and (iii) [plaintiff] has been induced to enter into this Agreement with [defendant] and is relying upon the representation and covenant by [defendant] that he will abide by and be bound by each of the covenants and agreements set forth [in the restrictive covenant section of the employment agreement].

[Emphasis added.]

When, as here, equitable considerations are paramount, those actions constitute crass opportunistic behavior deserving of nothing more than our condemnation. Therefore, because I would affirm in all respects the thoughtful opinion of the Appellate Division, *Cmty. Hosp. Group, Inc. v. More,* 365 *N.J.Super.* 84, 838 *A.*2d 472 (App.Div.2003), I must respectfully dissent from that part of the Court's opinion that "blue pencils" the geographic limits of the restrictive covenant and remands the case to the Chancery Division.

*For affirmance in part, reversal in part, remandment*—Chief Justice PORITZ and Justices LONG, LAVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*For concurrence in part, reversal in part*—Justice RIVERA-SOTO—1.