Lauriat, Peter M., J.
Ethicon Endo-Surgeiy, Inc. (“EES”), a medical device company, has brought this action against a former employee, Robert Pemberton (“Pemberton”), asserting claims of breach of contract, breach of implied covenant of good faith and fair dealing, and misappropriation and threatened misappropriation of trade secrets. EES has also brought suit against Pemberton’s new employer, Intuitive Surgical, Inc. (“Intuitive”), asserting claims of tortious interference with contract and violation of Chapter 93A.
The matter is now before the court on EES’s Motion for a Preliminary Injunction. EES seeks to bar Pemberton from working for Intuitive pursuant to a non-competition agreement contained in the employment contract between EES and Pemberton. For the reasons stated below, EES’s Motion for a Preliminary Injunction is allowed.
BACKGROUND
The preliminary determinations summarized below are “based on the affidavits, attached exhibits, and motions furnished by the parties, as well as reasonable inferences from that evidence.” Fazio v. Bank of America, Middlesex Civil Action No. 2010-1255, 2010 WL 2432024 (Mass.Super. 2010) [27 Mass. L. Rptr. 81]. The court also relies on the parties’ oral arguments.
A. The Competitive Companies and Products
EES is an Ohio corporation with its principal place of business in Ohio. Its parent company, Johnson & Johnson, is a New Jersey corporation with its principal place of business in New Jersey. EES manufactures and sells medical devices for both traditional surgery and minimally invasive surgery. EES’s minimally invasive surgical devices are typically single-use, disposable instruments, such as staplers, trocars, and scalpels.
Intuitive is a Delaware corporation with its principal place of business in California. Its “flagship” product is the da Vinci Surgical System (the “da Vinci system”), which permits surgeons to perform minimally invasive surgeries using robotics technology.[1] The da Vinci system has four robotic arms per unit, and at the end of each arm is an “EndoWrist” instrument.
Although EES does not sell any robotic systems, EES alleges that the da Vinci system competes with EES’s minimally invasive surgical devices on a macro level, in that it is designed for minimally invasive surgical procedures in which EES specializes, such as gynecological and thoracic procedures. In particular, EES alleges that Intuitive’s EndoWrist instruments directly compete with some of EES’s devices, such as EES’s trocars, clip appliers, and graspers. Thus, EES claims that Intuitive is a “CONFLICTING COMPANY” *543 selling a “CONFLICTING PRODUCT” under the terms of its non-competition agreement, addressed below.
B. The Non-competition Agreement
When Pemberton began working for EES in 2004, he signed an “Employee Secrecy, Non-Competition, and Non-Solicitation Agreement (“the Agreement”). The Agreement was between Pemberton and ’’the COMPANY," which was defined as EES, Johnson & Johnson, and their successors, assigns, purchasers, acquirers, subsidiaries, divisions, or affiliates.
The Agreement contains a choice of law provision stipulating that New Jersey law would control any disputes between the parties.
The non-competition provision in dispute is laid out, for purposes of this action, in four basic parts. It begins as follows:
During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign countiy or territoiy in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION . . .
There is an exception to this initial provision, namely, working for a CONFLICTING ORGANIZATION that is diversified and “which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION . . .”
Second, Pemberton agreed that for eighteen months after his employment with EES, he would not “render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.”
Third, Pemberton agreed that, for this eighteen-month period, he would not “solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY . . .”
Fourth, Pemberton agreed to notify EES of his new employer, job title, and responsibilities, in the event that he left the company.
As a final but important matter, the Agreement stipulated that EES would pay Pemberton his gross pay for every month, if any, that the noncompetition agreement prevented him from finding employment equivalent to his training or experience. EES would also make up the difference between his salary at EES and his new salary if he accepted a lower-paying position because of the Agreement.
C. Pemberton’s Employment with EES and Intuitive
In his position as a sales representative at EES, Pemberton primarily sold surgical staplers, trocars, and non-robotic harmonic scalpels to surgeons in northern Massachusetts, New Hampshire, and Maine. He did not work in Boston.
In April 2009, he became an Education Strategist. As such, he supported sales teams by organizing educational programs by and for surgeons. He did not prepare educational materials himself, but rather administered the programs by, for example, booking hotel rooms. He worked closely with about twenty surgeons in the Northeast who lectured at his programs, three of whom worked in Boston.
EES alleges that in both of his positions, Pemberton received confidential information about “target customers, emerging technologies and surgical trends, EES’s strategy to address robotic surgery, clinical and regulatory plans, EES market share data, and integrated business strategies.” Pemberton also had access to an intranet site and shared drives with additional information on sales history and projections, marketing strategies, and other data. A significant portion of Pemberton’s time, in both positions, was devoted to establishing good will with the surgeons to whom he marketed EES products.
On September 21, 2010, Pemberton announced his resignation from EES effective October 4, 2010. He declined to answer questions about where he would be working next and claimed he was still working out the details. Pemberton admits, however, that he received a letter from Intuitive on September 17, 2010, offering him a position there as a sales representative. Pemberton has not alleged that he had any doubt as to whether he would take the offer, despite his statements to EES. In fact, on or about September 18, 2010, Pemberton signed a definitive employment agreement with Intuitive, and on September 22, 2010, Pemberton and Intuitive jointly filed a complaint for a declaratory judgment in the Superior Court of California, seeking a judgment that EES’s non-competition agreement was unenforceable. Pemberton and Intuitive moved to consolidate their action with four other pending cases between Intuitive, EES, and former EES employees. In one of these cases, the California court has issued a preliminary injunction against EES, barring them from enforcing the same non-competition agreement at issue here. Intuitive Surgical, Inc., v. Ethicon Endo-Surgery, Inc., Superior Court of California, No. 110-CV-183148, Order Granting Prelim. Inj. (Oct. 14, 2010) (in a dispute involving former EES employee Kevin Mewborn).
Nevertheless, Pemberton did not inform EES that he had accepted a position at Intuitive until his last day of work on October 4, 2010. On this same date, Intuitive and Pemberton served their California complaint for a declaratoiy judgment upon EES. Four days *544 later, EES filed the present action against Intuitive and Pemberton.
At Intuitive, Pemberton was to be employed as a sales manager. For the first seven weeks of his employment at Intuitive, Pemberton would complete an online training program from his home office. Thereafter, he would begin marketing the da Vinci system to three or four hospitals in the Boston area. Pemberton would have a base salary of $65,000 per year, with substantial bonuses and commissions. He claims that if he were to meet all of his sales targets, he would earn $244,000 per year. At EES, as an Educational Strategist, Pemberton received a salary of $111,999 per year, plus stock grants and other benefits.
EES alleges that Pemberton could use EES’s confidential information, such as sales tactics, product data, and customer data to facilitate sales of Intuitive’s products.[2]
DISCUSSION
A. First-Filed Action Rule
Intuitive argues that this court should give effect to the first-filed rule and dismiss EES’s complaint so that it’s action against EES may continue in California. “As between a mirror-image declaratory judgment action and an affirmative [ ] action . . . , the general rule favors the forum of the first-filed action.” DuPont Pharmaceuticals Co. v. Sonus Pharmaceuticals, Inc., 122 F.Sup.2d 230 (Mass. 2000) (citation omitted). However, the first-filed rule is a presumption, and it is “not unrebuttable.” Id. When exercising its discretion on this matter, the court must consider the following factors: “judicial and litigant economy, the just and effective disposition of disputes, the possible absence of jurisdiction over all necessary and desirable parties, as well as a balancing of conveniences that may favor the second forum.” Id.
It is true that Intuitive’s complaint was filed before EES’s. Pemberton and Intuitive were able to file first, however, because Pemberton did not inform EES of his employment with Intuitive until after Intuitive filed suit. While this court appreciates that discovery has already begun in the four consolidated actions from April and May 2010, it cannot condone Intuitive’s behavior by dismissing EES’s action under the first-filed rule.[3]
Pemberton and Intuitive urge this court to “consider the California Order [in the Mewborn case] and apply appropriate principles of comity, to avoid conflicting orders in this case.” Quite simply, principles of comity do not require this court to follow the California court’s decision, particularly given that California has a public policy against noncompetition agreements that Massachusetts does not share. Indeed, as Intuitive’s counsel admitted in oral arguments, California is an “outlier” among the states in its refusal to enforce noncompetition agreements. See Advanced Bionics Corp. et al. v. Medtronic, Inc., 29 Cal.4th 697 at 706 (2002) (noting California’s policy against noncompetition agreements); Cal. Bus. & Prof. Code §16600 (“Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void”); but see id. §17200 (allowing noncompe-tition agreements to the extent needed to protect trade secrets). Compare Solari Industries, Inc. v. Malady, 55 N.J. 571, 576 (N.J. 1970) (noting that noncompetition agreements are now generally accepted).
Moreover, this court is not bound by the laws or judicial system of California. See Advanced Bionics Corp., 29 Cal.4th at 706-07 (holding that a California trial court could not issue a temporary restraining order prohibiting parties in another state from enforcing a noncompetition agreement, due to principles of state sovereignty and comfiy concerns). Nor can this court rely upon the California court’s rationale for its Order, as the rationale for the Order was not explained.
B. Choice of Laws Provision in the Agreement
“Massachusetts courts give effect to the law reasonably chosen by the parties to govern their rights under contracts.” Shipley Co., Inc. v. Clark, 728 F.Sup. 818, 825 (Mass. 1990) (citing Morris v. Watsco, Inc., 385 Mass. 672, 674-75 (1982)). In the present case, the Agreement stipulates that New Jersey law controls. Intuitive argues that the parties’ choice of law provision should not be given effect and that, instead, California law should apply.
A choice of law provision “will not be honored . . . where its application ‘would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law by the parties.’ ” Id. (quoting Restatement (Second) of Conflict of Laws, §187(2)(b) (1971)).
In other words, for California law to apply, “a) [California] must have a fundamental policy against no-compete agreements; b) [California] must have a materially greater interest than [New Jersey] in the determination of the issue; and c) [California] law would have applied in the absence of the express provision.” Id. (brackets added).
While California does indeed have a fundamental policy against non-competition agreements, it is difficult to conceive of how its interest is “materially” greater than New Jersey’s. Intuitive argues that the New Jersey choice of law provision is unreasonable because the parties’ only connection to New Jersey is the location of the headquarters of EES’s parent company, Johnson & Johnson. This argument is disingenuous because the parties’ only connection to California is the location of Intuitive’s headquarters.[4] Since their interest is essentially the same, California’s interest is not “materially” greater than New Jersey’s.
*545 In any event, Intuitive’s argument fails at the third prong of the test because if there were no choice of law provision, the law of Massachusetts would apply, not that of California. The events took place in Massachusetts between a Massachusetts resident and two companies doing business in Massachusetts. Massachusetts would seem, consequently, to have the strongest interest in the case. Neither party argues for Massachusetts law to apply, however. The court finds the choice of law provision enforceable and will apply New Jersey law to the question of the non-competition agreement’s validity.
C. Validity of Non-competition Agreement under New Jersey Law
Under New Jersey law, non-competition agreements are “given effect if they are reasonable in view of all the circumstances of the particular case.” Solari Industries, 55 N.J. at 576. Such an agreement will be found reasonable, in general, if it “simply protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public.” Id. When analyzing the first prong, the employer’s legitimate interests, “three additional factors should be considered in determining whether the restrictive covenant is overbroad: its duration, the geographic limits, and the scope of activities prohibited.” Community Hosp.Group, Inc. v. More, 183 N.J. 36, 58 (2005).
In the present case, the EES non-competition agreement satisfies these tests. Johnson & Johnson v. Biomet, Superior Court of New Jersey, C.A. No. C-107-07, Letter Op. on Motion for Prelim. Inj. Relief, at 17 (Dec. 6, 2007) (finding that the same Agreement as in this case, although in the context of a different Johnson & Johnson subsidiary, “m[et] the general requirements of New Jersey law as set forth in Solari, Whitmyer, and Karlin”).
Since this noncompetition agreement does not implicate the public interest, the court focuses on the first two factors.
1. Legitimate Interests of the Employer
Employers have no legitimate interest in preventing competition “as such.” Whitmeyer Bros., Inc. v. Doyle, 58 N.J. 25, 33-34 (1971). They do, however, have a legitimate interest in protecting confidential business information, as well as trade secrets. Id. at 33. “General knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection nor will routine or trivial difference in practices and methods suffice to support restraint of the employee’s competition.” Id. at 33-34. Intuitive alleges that Pemberton has received very little, if any, trade secrets or confidential information from EES, especially in his position as an Education Strategist. EES, on the other hand, alleges that in both of his positions, Pemberton received confidential information about “target customers, emerging technologies and surgical trends, EES’s strategy to address robotic surgeiy, clinical and regulatory plans, EES market share data, and integrated business strategies.” If true, these data are clearly not “general information within the industry” nor are they “routine and trivial differences in practices and methods.” Although there are some differences in their products, EES has alleged enough to show that the two companies are competitors, i.e., that their products conflict under the non-competition agreement.
As for the other three factors, the court agrees with Intuitive that the Agreement is somewhat overbroad. A non-competition agreement may be “enforced as written, or, if appropriate, reduced in scope.” More, 183 N.J. at 64. Eighteen months, while long, is not per se an unreasonable length of time. See, e.g., id. (two years).
However, the court is concerned by the nationwide scope of the Agreement. The likelihood of Pemberton using EES’s confidential information or trade secrets, whether intentionally or unintentionally, seems greatest when he is working in the same area of the country in which he worked for EES. Pemberton is a salesperson and educational strategist, not a scientist. Thus, the court finds it appropriate to modify the Agreement so that Pemberton is prohibited from working for a “CONFLICTING COMPANY” only in the geographic areas in which he has worked for EES, that is, Maine, New Hampshire, and Massachusetts.
2. Undue Hardship to the Employee
Under this prong, it is first necessary to inquire as to “the likelihood of the employee finding work in his field elsewhere.” Karlin v. Weinberg, 77 N.J. 408, 423 (N.J. 1978). With the non-competition modified as above, Pemberton has a substantial likelihood of finding work in his field. Secondly, “where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship.” Id. at 423-24. Although Pemberton alleges he had legitimate reasons for leaving EES, it was still his decision to do so. Perhaps most importantly, however, Pemberton will not suffer from financial harm because EES will compensate him for every month in which he cannot work due to the non-competition agreement.[5] As modified by this court, the court concludes that the non-competition agreement is fair and valid under New Jersey law.
D. Preliminary Injunction
A preliminary injunction may be granted if a three-part test is met. First, it must be reasonably likely that the movant will succeed on the merits of its claims; second, the movant must suffer irreparable harm in the absence of injunctive relief; and third, such harm must outweigh any injury the other party may sustain if the injunction is granted. Packaging Industries v. Cheney, 380 Mass. 609, 617 (1980). In some circum *546 stances, the court must also consider whether the public interest will be adversely affected by the granting of the injunction. Roll Systems, Inc. v. Shupe, 1998 U.S.Dist.LEXIS 3142 (D.Mass. 1998); Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 501 (1986).
Since the non-competition is reasonable under New Jersey law, EES has demonstrated a likelihood of success on the merits of their claim. The remaining questions are whether the harm to EES would be irreparable and whether any such harm to EES outweighs any harm that may occur to Intuitive or Pemberton. The public interest is not implicated by this Agreement.
1. Irreparable Harm to EES
The disclosure of trade secrets or confidential information would cause irreparable harm to EES. It is not necessary to pinpoint a specific amount of damages that EES would suffer. Kroeger v. Stop & Shop Co., 13 Mass.App.Ct. 310, 322 (1982). Indeed, the difficulty in quantifying money damages is a basis for equitable relief.
The defendants argue that EES cannot possibly suffer from irreparable harm because Pemberton will only be in training for the first seven weeks of his employment. It is true that “(ijrreparable harm is absent if trial on the merits can be conducted before the injury occurs." Packaging Industries, 380 Mass. at 617 n. 11. Even if it were possible to conduct a trial on the merits within the next seven weeks, however, Pemberton could reveal confidential information in staff meetings, planning sessions with supervisors, or other preparatory matters that are not strictly sales. See Johnson & Johnson, C.A. No. C-107-07 at 20 (“During the time the litigation is taking place, the former employee . .. would be sitting in the same sort of meetings she attended for DePuy and talking about the same sort of issues she discussed at DePuy meetings, with knowledge of DePuy confidential information fresh in her mind, but the meetings would be for the benefit of a competitor . . .”).
2. Balancing of the Equities
As described above, Pemberton should easily be able to find a position in his field outside the proscribed geographic area, will suffer no serious financial harm, and made the decision himself to terminate his employment with EES. Intuitive’s harm, if any, has not been shown. Since EES is likely to suffer irreparable harm and since the defendants have not alleged the same, the equities favor granting the preliminary injunction. See Planned Parenthood League of Mass., Inc. v. Operation Rescue, 406 Mass. 701, 714 (1990).
Since EES will be paying Pemberton’s salary, the court will not require EES to post a bond at this time. See Mass.R.Civ.P. 65(c). This decision is made without prejudice, however, to the defendants applying for a bond at a later time.
ORDER
For the forgoing reasons, it is ORDERED that a preliminary injunction shall enter:
1. requiring Pemberton to abide by the terms of his Non-competition Agreement with EES;
2. restraining Pemberton from working for, or rendering services to Intuitive Surgical, Inc., in Massachusetts, New Hampshire, or Maine;
3. restraining Pemberton, and all persons acting in concert with him, including any officer, agent, employee, and/or representative of Intuitive Surgical, Inc., from directly or indirectly:
(a) using, disclosing, or transmitting EES’s confidential or trade secret information for any purpose (including, without limitation, engaging in competition with EES or soliciting EES’s customers or employees); and
(b) directly or indirectly soliciting any business from any account, customer or client of EES with whom Pemberton had contact within the last twelve months of his employment with EES.
4. The defendants, and all persons acting in concert with them, must return to EES, within ten days of actual notice of the Court’s Order, all originals, copies, or other reproductions, in any form whatsoever, of any record or document containing, in whole or in part, any confidential information belonging to EES.

 The system apparently consists of a surgeon’s console, a patient-side cart with four interactive robotic arms, a “vision system,” and the EndoWrist instruments. The vision system is described as an “[a]dvanced 3D [¶] visualization with up to lOx magnification and an immersive view of the operative field.”

 EES also alleges that Intuitive has engaged in a pattern of aggressively recruiting EES’s employees in order to obtain EES’s confidential information and trade secrets. EES has submitted cases from Ohio and North Carolina in which a preliminary injunction and a temporary restraining order, respectively, were granted against Intuitive and the former employees. The court does not reach this issue, but notes that these cases provide a telling counterweight to the decision of the California court.

 The defendants’ actions cannot even be compared to a race to the courthouse, since they failed to even notify EES that there was a race until they had already crossed the finish line and hoisted the trophy.

 Intuitive has occasionally alleged that Pemberton will perform some of his work in California, without specifics. The assertions are too vague to be creditable.

 Pemberton argues that he is still harmed financially because he would have earned more income at Intuitive that he earned at EES. He asserts that if he meets all of his sales targets, he will earn $244,500. The court finds this speculative. In addition, during the first seven weeks of his employment, Pemberton would be in the online training program. During this time, Pemberton would receive only his base salary of $65,000 plus the first quarter of a $25,000 “guarantee bonus” or $6,250. This would have been well below his salary at EES of $111,999.